PETITIONS OF THE DEPARTMENT OF SOCIAL SERVICES TO
DISPENSE WITH CONSENT TO ADOPTION.

Middlesex.  May 3, 1983. — August 1, 1983.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Adoption,* Dispensing with parent's consent.  *Parent and Child,* Custody
of minor.  *Due Process of Law,* Adoption.

In a proceeding to dispense with the need for a mother's consent to the
    adoption of two of her minor children, the judge was warranted in
    determining that the Department of Social Services had demonstrated
    by clear and convincing evidence that the mother was currently unfit
    to further the welfare and best interests of the children and that their
    best interests would be served by termination of the mother's parental
    rights and by their adoption by the paternal grandparents.  [799-802]
The presumption set out in G. L. c. 210, § 3, that, in the case of children
    who have been in the care of the Department of Social Services for
    more than one year, it is in their best interests for a court to dispense
    with parental consent to their adoption, violates a parent's due process
    rights secured by the Federal Constitution; however, a mother's rights
    were not violated where a judge's findings made clear that he did not
    rely on this presumption in his determination to dispense with the need
    for the mother's consent to the adoption of two of her minor children.
    [802-803]

PETITIONS filed in the Probate and Family Court Depart-
ment on November 19, 1980.

The cases were heard by *Ginsburg,* J.

After review was sought in the Appeals Court, the
Supreme Judicial Court ordered direct appellate review on
its own initiative.

*Leonard I. Shapiro* for the mother.

*Despena Fillios Billings,* Assistant Attorney General, for
Department of Social Services.

HENNESSEY, C.J.   This case involves appeals by the
natural mother from judgments of the Probate and Family

Court allowing two petitions of the Department of Social Services (department) to dispense with the need for consent of and notice to the mother in any subsequent proceedings for adoption of her male and female twin children who were born on November 8, 1975. We affirm the judge's decisions.

The department filed the petitions on November 19, 1980, in the Probate and Family Court, pursuant to G. L. c. 210, § 3. The mother filed a pro se appearance on December 30, 1980. A guardian ad litem was appointed on January 8, 1981, and he filed a report on April 21, 1981. On January 4, 1982, an attorney was appointed to represent the mother.

A hearing was held before a judge of the Probate Court on January 14 and 15, 1982. On January 21, 1982, the judge concluded that the parental rights of the mother should be terminated.[1] On July 13, 1982, the mother filed a motion for the judge to reconsider his findings in light of *Santosky* v. *Kramer*, 455 U.S. 745, 747-748 (1982), in which the United States Supreme Court held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." On July 14, 1982, the judge issued a memorandum and order finding that the department met the burden of proof called for in *Santosky* v. *Kramer, supra,* and, therefore, affirmed the judgment. We transferred the case to this court on our own motion.

---

[1] The judge's conclusions of law were set forth as follows:

"1. The evidence warrants the conclusion that the biological parent is currently unfit to assume parental responsibility for the children.

"2. The best interests of the children would be served by termination of parental rights.

"3. Where the children have been in the care of the Department of Social Services for more than one (1) year, the presumption that it is in the best interests of the children to enter a decree dispensing with the parental consent to adoption [pursuant to M. G. L. c. 210, § 3 (c)] has not been overcome.

"4. The plan prepared and propounded by the petitioners does serve the best interests of the children."

On appeal the mother argues that the department has failed to demonstrate by clear and convincing evidence that the natural mother was unfit to provide for the best interests of the children. The mother also contends that the application of the statutory presumption of G. L. c. 210, § 3 (c), that it is in the best interests of the children to enter a decree dispensing with parental consent to adoption when the children have been in the department's care for one year violates the due process clause of the Fourteenth Amendment to the United States Constitution. After the case was argued before this court, we requested the judge to make further findings stating what weight, if any, he gave to the statutory presumption in reaching his decision. In his responsive findings the judge stated that he gave no weight or effect to the presumption.

We summarize the relevant facts. The mother, who was born in 1954, experienced a troubled childhood, was placed in foster homes, and was admitted to psychiatric institutions. She attended school through the eighth grade and left home at the age of fifteen. She has never married, is unemployed, and is receiving AFDC benefits. The mother's most recent psychiatric hospitalization occurred when she was twenty-four years old. The mother has four children. Two of her children, a nine year old girl and a five year old boy, currently reside with the mother in Cambridge, and are not the subjects of the current appeal. The other two children are the seven year old twins who are the subjects of this appeal. The natural father of the twins is deceased. The twins have resided in Alabama with their paternal grandparents and prospective adoptive parents since December 19, 1981.

The mother has demonstrated a pattern of calling the department when she feels under stress and requesting that one or more of the children be placed in foster homes, and then later reclaiming the children. The oldest child and the twins were placed voluntarily in a foster home on December 2, 1976. On December 22, 1976, the oldest child was returned to the mother upon her request. On January 21, 1977, the twins were returned to the mother at her request.

On or about May 15, 1979, the mother called the department and asked that the female twin be placed in a foster home because she was unable to handle her. The mother signed a voluntary agreement placing the female twin in foster care. In August, 1981, the mother approached the department with her two other children, asking that they be taken by the department.[2]

On June 26, 1979, a care and protection petition was filed in the Cambridge Division of the District Court Department on behalf of all four children.[3] At an initial hearing, legal and physical custody of the female twin was granted to the department, while only legal custody of the other three children was granted to the department. At a later hearing on September 7, 1979, the case involving the oldest and youngest children was dismissed but the prior custody orders remained in effect as to the twins. On November 16, 1979, at another hearing, physical custody of the male twin was granted to the department. In early 1980, another care and protection petition was filed on behalf of the other two children and, after hearing, that case was dismissed. Permanent custody of the twins was granted to the department on September 26, 1980; the mother was not present at the hearing.

---

[2] A supervisor at the department related her conversation of August 13, 1981, with the mother, as follows: "She [the mother] said that she was very young and she wanted to get on with her life; and we should take the children. . . . [I]f we did not place [the other two children] that day, she would leave them on a doorstep. . . . She told me that they would get used to it [her leaving them] the same as if she had died . . . [and that] this was best for the children. I told her this sounded really impulsive to me [but] she told me that is wasn't a spur of the moment decision. . . . [S]he thought it would take [her] three to five years to get herself together and at that point she would come back for them."

[3] This petition was filed after the mother's boy friend reported to the department that the mother had put the male twin into a closet as punishment. The boy friend called the department shortly after reporting this incident and told a staff member of the department that he had lied.

A previous care and protection petition had been filed in Cambridge District Court on February 15, 1977. On June 27, 1977, that case was dismissed.

The twins suffer from both physical and emotional deficiencies. The female twin must wear a hearing aid in each ear. While her I.Q. is in the high average range, she has been diagnosed as having a character disorder which results in, among other things, difficulty with interpersonal relationships, hitting, cursing, and rejecting affection. The male twin has difficulty with visual motor coordination, is a slow learner with learning disabilities, and has a low self-esteem. His I.Q. is in the low average range, and he will require special education classes in school. Both twins have progressed and their respective problems diminished while they were enrolled in the Community Preschool Therapeutic Nursery in Brookline.

Since 1976, with the assistance of various social workers, the department has proposed a number of service plans that would have eventually reunited the twins with their mother. The mother, however, has refused to follow through on any consistent plan to be reunited with her children. She has been unable to maintain a consistent, positive relationship with the social workers from the department and she places the total blame for breakdowns in communications upon them. The mother feels that she was betrayed by the department in that she asked for help with the children, and the workers, instead of helping her, eventually took the children away from her. Under one of the service plans, the mother was evaluated by a psychiatrist who, on the basis of a single forty-five minute visit in 1980, could not say that she was an unfit mother. She has refused to participate in any other evaluation.

The mother took part in supervised visits with the twins on a number of occasions between the time of their placement in a foster home in May and November of 1979, and January 6, 1981, when she removed the children illegally from the foster home. After that date, the department forbade any subsequent visits. A department social worker testified that the mother's contact with the twins during these visits was minimal and disinterested.[4]

[4] The report of the guardian ad litem also indicated minimal contact between the mother and the twins: "[The foster mother] stated that the

There was other testimony that revealed that the mother did not have a warm or supportive relationship with the twins.  A social worker testified that the male twin "was removed in November [1979] because [the mother] stated that he was also possessed by the Devil. . . . Because he never smiled. . . .  He never smiles, he is spacy and nervous and doesn't speak."  Furthermore, in May, 1979, the female twin was removed from the mother's home after a telephone call from the mother to the department during which she "was yelling and screaming on the phone to remove her daughter . . . immediately.  That she was possessed.  That she had no control over her."  Several months later, the mother said "that she wanted her daughter back; but if the court was going to take them away she wasn't going to fight because [the female twin] was not worth it."  Finally, there was testimony presented that indicated that the mother favors her two other children and that she did not like the twins' father because he supposedly cast a "spell" on her during her pregnancy and that the twins are "possessed."

Professionals involved in testing and educating the children all testified that the prognosis for their development was good if they were able to function in a stable, secure home environment.  It was acknowledged that a special needs school of the same caliber as the one which they attended is not available in Alabama where the prospective adoptive parents live.  There was consensus among school and department personnel, however, that while both children need special services, the highest priority is placement in secure family environment and that the twins could not learn unless they were in a safe and secure family situation.

---

mother . . . only came to see them once in about every eight months; that when present she professed her love for them but at the same time did not appreciate them getting on her lap which might soil the particular outfit she was wearing at the time.  When her son . . . would ask 'When are we going home?', all she would say is 'They won't let you.'  She, the mother, apparently on different occasions has told . . . the foster mother, that she could have all four of her kids."

1. Based on all the evidence, the judge concluded that the mother is currently unfit to assume parental responsibility for the twins, and that the best interests of the twins would be served by termination of parental rights. Furthermore, upon the mother's motion to reconsider his findings in light of *Santosky* v. *Kramer*, 455 U.S. 745 (1982), the judge concluded that the department had proved by clear and convincing evidence that the mother is currently unfit to further the welfare and best interests of the twins. We perceive no error in the judge's determination.

The critical issue presented in a case seeking to dispense with the need for parental consent to adoption "is whether the natural parents are currently fit to further the welfare and best interests of the child." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 589 (1981), quoting *Bezio* v. *Patenaude,* 381 Mass. 563, 576 (1980). In resolving this issue we are guided by the underlying premise that natural parents have a fundamental right to the custody of their children. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 587. Nevertheless, this right is not absolute and "the first and paramount duty of courts is to consult the welfare of the child." *Id.* at 588, quoting *Richards* v. *Forrest,* 278 Mass. 547, 553 (1932). *Custody of a Minor, ante* 755, 765 (1983). A child's welfare, we have acknowledged, "is best served in a stable, continuous family environment." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra.*

We have articulated certain standards to be considered in determining whether the natural parents are currently unfit to provide for the best interests of their child. We have stated: "It is conceivable that certain parents might be fit to bring up one child and unfit to bring up another. In this connection the welfare of the child is important. . . . The unfitness of parents . . . must be determined with respect both to their own character, temperament, capacity, and conduct, and to the welfare of the child in connection with its age, environment and affections." *Petition of the Dep't*

*of Pub. Welfare to Dispense with Consent to Adoption, supra* at 589, quoting *Richards* v. *Forrest, supra* at 553-554. Thus, in deciding whether natural parents may be deprived of the custody of their minor children, both the fitness of the parents and the needs of the particular children must be examined. It is clear from our cases that "[n]either the 'parental fitness' test nor the 'best interests of the child' test is properly applied to the exclusion of the other. . . . [These two tests] 'reflect different degrees of emphasis on the same factors[.] . . . [T]he tests are not separate and distinct but cognate and connected.'" *Bezio* v. *Patenaude, supra* at 576-577, quoting *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption,* 367 Mass. 631, 641 (1975). We have further indicated, however, that although the best interests of the child should be considered, "natural parents may not be deprived of the custody of their minor children in the absence of a showing that they 'have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard,' or 'unless some factor such as lengthy separation and a corresponding growth in the ties between the child and the prospective adoptive parents indicate[s] that the child would be hurt by being returned to the natural parents.'" *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 590, quoting *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, supra* at 639, 646.

Applying these standards to the facts in the case at bar, we conclude that the judge was warranted in determining that there was clear and convincing evidence that the mother is currently unfit to assume parental responsibility for the twins and that their best interests would be served by termination of the mother's parental rights and by their adoption by the paternal grandparents. The mother contends that the evidence of current parental unfitness is virtually nonexistent. She points out that there is no evidence that she physically mistreated any of her children and that

there is ample evidence of her capacity to be a loving and effective mother.[5] She acknowledges that the judge based his finding of unfitness on the mother's repeated pattern of turning to the department in periods of stress, then later reclaiming the children, and on her demonstrated inability to cooperate consistently with employees of the department in carrying out various service plans. She contends, however, that her decisions in the past to relinquish custody voluntarily may not be used to demonstrate current parental unfitness. She relies on *Bezio* v. *Patenaude*, 381 Mass. 563, 577 (1980), where we stated: "Mere failure to exercise custodial rights in the past, particularly where a parent has voluntarily relinquished custody 'for appropriate reasons,' (*Little Wanderers, supra* at 640) does not support a conclusion that such parent in unfit to further the welfare of the child." This case, however, presents a repeated pattern of turning to the department for help and then refusing to accept any help, rather than an isolated instance of relinquishment of custody. Thus, the judge properly made "an assessment of prognostic evidence derived from an ongoing pattern of parental neglect or misconduct . . . [in determining] future fitness and the likelihood of harm to the [children]." *Bezio* v. *Patenaude, supra,* quoting *Custody of a Minor (No. 1),* 377 Mass. 876, 883 (1979). The mother also urges, however, that her refusal to participate in the various service plans offered by the department was caused by the department's alleged repeated attempts to sever all family

---

[5] Specifically, the mother points to the testimony of a social worker who stated that she had previously recommended that, if the mother accepted social services, the department would try to return the children to her. The social worker also testified that, from her observations, the mother was functioning well with regard to the oldest and youngest children. The mother also relies on testimony from one Janice Gould, a registered nurse who has known the mother since 1972, who stated that when she made visits to the home, the mother was very loving, and the children were always clean.

Finally, the mother relies on her own testimony in which she stated that she understood the need to plan for the reintegration of the twins into her family, as well as the report of the psychiatrist who perceived no evidence on which to conclude that the mother was unfit.

ties in violation of its duty "to direct its efforts . . . to the strengthening and encouragement of family life . . . ." *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 262 (1978), quoting G. L. c. 119, § 1. While it is true that the mother testified that she felt as though the social workers from the department were working against her, other evidence in the case demonstrates that the department was attempting to reunite the mother with her children by proposing various service plans and that is was the mother who was unable to carry through on any of the plans. The judge specifically found that it was the mother who could not, on a consistent basis, maintain a positive relationship with the department's employees. We note that "[t]he probate judge was in the best position to determine the weight of the evidence and credibility of the witnessess." *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. 482, 488-489 (1982). We perceive no error in the judge's findings or his ultimate conclusions.

2. The mother's second argument is that the statutory presumption of G. L. c. 210, § 3 (c), violates her due process rights under the Fourteenth Amendment to the United States Constitution. General Laws c. 210, § 3 (c), as amended by St. 1978, c. 552, § 36, provides in pertinent part: "If said child has been in the care of the department or a licensed child care agency for more than one year . . . there shall be a presumption that the best interests of the child will be served by granting a petition for adoption . . . or by issuing a decree dispensing with the need for consent . . . ." The mother contends that this presumption is rendered unconstitutional by the holding of *Santosky* v. *Kramer*, 455 U.S. 745, 747-748 (1982), that before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires the State to support its allegations by at least clear and convincing evidence. The presumption is unconstitutional, the mother argues, because once the facts supporting the presumption are shown, the parent becomes obligated to demonstrate

affirmatively that he or she is currently fit to assume parental responsibility and that the best interests of the child would be served by preservation of parental rights. The mother submits that requiring such an affirmative showing on the parent's part violates the mandate of *Santosky, supra,* and impermissibly shifts the burden of proof to the parent. See *Mullaney* v. *Wilbur,* 421 U.S. 684, 703-704 (1975).

We agree with the mother's arguments. Under *Santosky,* the statutory presumption is unconstitutional. Nevertheless, the mother's rights were not violated in this case. The judge had made clear in his supplementary findings that he did not rely in any way on this statutory provision in reaching his conclusion.

In sum, we conclude that the judge correctly determined that the department has proved by clear and convincing evidence that the mother is currently unfit to further the best interests of the twins, and we also conclude that the mother's constitutional rights have not been violated.

*Judgments affirmed.*