## PETITIONS OF THE DEPARTMENT OF SOCIAL SERVICES TO DISPENSE WITH CONSENT TO ADOPTION.

Hampden.    March 21, 1984. — May 14, 1984.

Present: GREANEY, C.J., DREBEN, & SMITH, JJ.

*Adoption,* Dispensing with parent's consent.

In proceedings to dispense with the parents' consents to the adoption of two minor children, who had been taken from the parents four years earlier pursuant to a court order and had since been living in foster homes, evidence of the serious continuing emotional problems affecting both the parents and the children warranted the judge's conclusion that the parents were currently unfit to further the welfare and best interests of the children. [125-128]

PETITIONS filed in the Hampden Division of the Probate and Family Court Department on November 13, 1980.

The cases were heard by *Rodgers, J.*

*Stanley R. Light* for the mother.

*M. Trant Campbell* for the father.

*Kathleen M. Bowers,* Assistant Attorney General (*Barbara F. Greenlee* with her) for Department of Social Services.

GREANEY, C.J.    This is an appeal by the parents from decrees of a Probate Court entered pursuant to G. L. c. 210, § 3, dispensing with the need for the parents' consents to the adoption of two minor children. We affirm the decrees, concluding that the Department of Social Services (department) established by clear and convincing evidence that the parents are currently unfit to further the welfare and best interests of either of the children. See *Santosky* v. *Kramer,* 455 U.S. 745, 747-748, 769-770 (1982).

We summarize the facts.    The parents were married in March, 1973. Five children were born to the marriage, one of

whom died in 1975 at the age of ten months. Two children presently reside with the parents[1] and are not involved in this appeal. At issue is the status of two boys, J (born in 1973) and A (born in 1975).

Since 1973, the parents and children have been frequently evaluated by various social service agencies. On May 11, 1976, petitions for the care and protection of J and A were filed in a District Court under G. L. c. 119, § 24. After a hearing, the department was granted permanent custody of the children. The case was subsequently reviewed several times by judges of the District Court, and on February 7, 1979, the District Court reentered its order giving the department permanent custody.[2]

When the children were removed from their parents' home in 1976, J was two and one-half years old and A was six months

---

[1] It was disclosed at oral agrument that the youngest child was born during the pendency of these proceedings.

[2] This order was then appealed by the parents and heard de novo in the Springfield Juvenile Court, which on December 29, 1979, also ordered permanent custody granted to the department. The Juvenile Court judge made the following findings: "[1] [A] licensed clinical psychologist, requested to evaluate [the parents], concluded that though they are functioning somewhat better than they were in 1976, their basic relating patterns as a couple have changed little, and that they do not have the ability to constructively deal with the stress of adding two children to their family, let alone considering the effect on the children. [2] The [parents] know very little about the children having had no contact with them for about two years. [3] [The] parents are not able to identify any need for therapeutic interventions, see no need for counseling, but would be willing to get counseling to get the children back. [4] They have failed in the past to avail themselves of services, and except for [the father's] in court declaration of willingness to comply, there is little basis to indicate that participation would be active. [5] [J] has settled very well in the foster home and needs a feeling of permanence and belonging. [6] [A] has been in the same foster placement for about three years and the foster parents are the only parents he knows. [7] Both boys are happily settled in families they consider their own. Disruption of the boys living arrangement would be severely detrimental to their emotional development. . . . [8] [T]he parents, although they profess love and a need for their children, are unable to provide proper care for [J] and [A] and that, because of [their] resistance to [obtain] meaningful counseling, will be unable for sometime to come to provide the stable and nurturing care the children require for their proper physical and moral development."

old. Since June 30, 1976, the parents have not been granted any rights of visitation. The denial of visitation rights was based principally upon the recommendation of the children's pediatrician, who indicated that visitations were detrimental to the children's well-being. While J and A have been in separate placements since September, 1978, the department has arranged several visits between them. On November 13, 1980, the department filed two petitions pursuant to G. L. c. 210, § 3(*b*), to dispense with parental consent to the adoption of J and A.

The mother has a history of psychiatric problems.[3] At the time of these proceedings, she was found to be "disorganized . . . in her thinking [and to have] a decided paranoid quality to her views."[4] At the time that J and A were removed from the home, the father was having a serious problem with alcohol. He has acknowledged difficulties in being a parent. The parents as a couple have a continuing history of marital discord aggravated by serious emotional difficulties. The have separated on several occasions. In 1976, the department's service plan for the parents included intensive therapy as a prerequisite to the return of J and A. The parents sporadically attended counselling sessions arranged by the department but eventually discontinued their participation, claiming that they did not need counselling or other supportive services.[5] The parents' emotional problems persisted at the time of the hearing.[6] The father was observed to be "very anxious and exhibiting a decisive tremor."

---

[3] At one point, she was diagnosed as a paranoid schizophrenic.

[4] This finding of the trial judge was based on a report by a clinical psychologist who evaluated the mother shortly before the hearing. The psychologist gave similar testimony at the hearing.

[5] A social worker of the department testified that the petitions were filed because the parents were not able to make progress as a couple, were not working together, were not able to follow through on the service plan, and could not adequately care for J and A.

[6] A clinical psychologist, after evaluating the parents shortly before the hearing, made the following observation: "There are indications that the parents' home is a fragile one in terms of the ability of the parents to function together, and the apparent emotional problems of each of the parents might well be exacerbated with the additional stress of either or both . . . children returning to [the parents'] home."

Since his removal from his parents' home, A has had a history of serious emotional problems that manifest themselves both at home and at school. His behavior has been described as uncontrollable, destructive, and disruptive. He is generally self-deprecatory and insecure over his status as a foster child.

Since his removal from his parents, J has been in three foster homes as well as a residential treatment center. The first[7] and second foster parents found J's behavior intolerable and requested his removal from their homes. In his third foster home, where he has developed a meaningful relationship with an adult figure (the foster mother), apparently for the first time in his life, he continues to exhibit problematic behavior.[8] Experts made strong recommendations, based upon current evaluations of the children and the parents, that J and A be freed for adoption immediately.[9]

---

[7] J's behavior at the first foster home had included "smearing his feces, soaking his bed, banging his head, nightmares, fitless sleep, scratching and biting himself, jamming objects down his throat and acting aggressively towards others."

[8] In a six month assessment evaluation prepared shortly before the hearing, a licensed therapist and supervisor for a family resource unit of a social service agency described J's behavior as self-abusive, defiant, aggressive towards others, and destructive. A clinical psychologist found that in 1982 J manifested considerable emotional problems. His behavior in school has been described at times as belligerent and disruptive.

[9] As to J, a report by a clinical psychologist made shortly before the hearing (and corroborated by the psychologist's testimony at the hearing) had the following to say: "[J] has apparently begun to form perhaps his most meaningful relationship with a parent figure in his present foster home. He is aware of his biological parents and he does not want to return to them. If the [foster parents] are in fact interested in adopting [J] then considerable thought must be given to the substantial psychological damage which he might well experience should he be removed [from their home]."

As to A, a report by two experts made prior to the hearing contained the following observations: "[W]e also recommend that a decision concerning [A's] adoptive status be reached in the near future. The reasoning behind this recommendation is the emotional strain on the part of all family members, especially on [A], caused by the postponement of such a decision. This postponement in terms of its ensuing uncertainty, insecurity, and emo-

The judge found that, while the parents were not currently as "disorganized" as they were in 1976, the improvement in their stability was minimal, and they were still unable to recognize any real need for supportive services. He noted that the parents were making progress with the one child they then had with them, but felt that the reintroduction of the two boys into the home would be a "disaster." He considered and rejected the parents' plan for reunification with J and A.[10] After considering all the evidence, the judge concluded that the parents' rights should be terminated because they were "currently unfit to assume the present responsibility for [J and A]."

1. The governing legal standard for these cases is set forth in par. (c) of G. L. c. 210, § 3, as appearing in St. 1972, c. 800, § 2, which provides in relevant part that a decree to dispense with the need for parental consent to adoption shall not enter until the judge has "consider[ed] the ability, capacity, fitness and readiness of the child's parents . . . to assume parental responsibility, and . . . the plan proposed by the department or other agency initiating the petition."[11] After weighing the statutory factors, the judge cannot terminate parental rights without a showing, by clear and convincing evidence, that the parents are currently unfit to further the welfare and best interests of their children. See *Santosky* v. *Kramer*,

---

tional ambivalence, has an ongoing anti-therapeutic effect for [A] and other family members."

As to both children, a clinical psychologist reached the following conclusion: "I am, however, pessimistic, despite their avowed affection for their children . . . that either [J] (or [A]) would make progress in their psychological development in the [parents'] household. It is imperative that these youngsters (and the adults involved, as well) have a sense of closure on this matter so that they might focus their attentions on looking ahead and not over their shoulders."

[10] The judge found that "The [parents] have submitted a plan to be reunited with their children. Due to the attitude of the parents, their past performance at rehabilitative services, lack of cooperation in past efforts to reunite them with the children, the length of time that the children have been separated from them and the lack of contact with the children, [their] plan does not offer a realistic alternative to the plans submitted by the Department."

[11] Although par. (c) of G. L. c. 210, § 3, speaks only of consideration of the department's plan, it is obvious that a judge before acting on a c. 210, § 3, petition must give equal consideration to any plan proposed by the parents. See *Freeman* v. *Chaplic,* 388 Mass. 398, 407 (1983). The judge's findings, see note 10, *supra,* demonstrate that he considered the parents' plan.

455 U.S. at 747-748, 769-770. See also *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. 793, 799 (1983); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. 113, 113-114 (1984); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 15 Mass. App. Ct. 161, 163 (1983).

Unfitness is a concept which cannot be applied in the abstract but requires careful consideration, on the facts of a given case, of the capacity of parents to care for their children. See *Freeman* v. *Chaplic,* 388 Mass. 398, 404-405 (1983); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 799-800; *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 15 Mass. App. Ct. at 164. The specialized needs of a particular child when combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 797, 799-800; *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 16 Mass. App. Ct. 965, 966 (1983). Because parental fitness must be evaluated in the context of a particular child's needs, "[i]t is conceivable that . . . parents might be fit to bring up one child and unfit to bring up another." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 589 (1981), quoting from *Richards* v. *Forrest,* 278 Mass. 547, 553 (1932). See also *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 799; *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 15 Mass. App. Ct. at 165.

2. Applying these standards to the present cases, we conclude that the judge was warranted in determining that the parents are currently unfit to assume parental responsibility for the specialized needs of either J or A. There was extensive evidence (in the form of both oral testimony and written reports) which demonstrated: (1) that J and A have had, and continue to have, serious emotional behavioral problems; (2) that the parents have ongoing emotional problems and tend to resist receiving any therapeutic services, the latter constituting a cornerstone of the departments' prior plan for reunifying J and A

with them; and (3) that the childrens' present needs are incompatible with the parents' present problems and their very fragile situation. On the ultimate finding of parental unfitness, an expert, who had evaluated both the children and the parents shortly before the hearing, testified (and the judge concurred) that "at this time [the parents] would not be fit parents of [J] and [A] because they will not be able . . . to meet the needs of the children, in terms of the emotional problems [that] the children are having." There was also considerable evidence that what J and A needed most was a final resolution of their status which would allow them to remain permanently in their present homes where their problems are being constructively addressed.

The parents argue that the judge improperly relied upon outdated information to find parental unfitness. They also contend that because J and A have been separated from them without visitations since 1976, a more appropriate order would require that another effort be made to reintroduce the children into the family. We disagree.

We recognize that isolated problems in the past or stale information cannot be a basis for a determination of current parental unfitness. See *Petition of Worcester Children's Friend Soc. to Dispense with Consent to Adoption,* 9 Mass. App. Ct. 594, 599 (1980). We are concerned, however, with serious continuing emotional problems affecting both the parents and the children. The judge properly assessed current data provided by evaluations conducted shortly before the hearing, and considered prognostic evidence, in considering whether the parents could become capable of furthering the welfare of J and A. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 801; *Petition of Catholic Charitable Bureau to Dispense with Consent to Adoption,* 13 Mass. App. Ct. 936, 938 (1982). We do not think, in the circumstances here present, that further efforts at uniting the family are called for because the evidence discloses that such efforts would be seriously detrimental to the children.[12]

---

[12] We note that, after the parents appeared in opposition to the petitions, the mother requested visitation with J. The department informed the mother

18 Mass. App. Ct. 120                    127

Petitions of the Department of Social Services to Dispense with Consent to Adoption.

Moreover, the long separation of J and A from the parents, considered in light of the evidence of current parental unfitness, also militates against an attempt at reunificiation. This is not a case where the parents voluntarily relinquished custody to the department. Compare *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. at 120-121. J and A were taken from them by order of court because of an established need for their care and protection. Nor is this a situation where the judge's determination of unfitness was based solely on factors such as the lengthy separation of J and A from their parents or the trauma that a reunification might cause. Compare *Ibid.* Rather, the judge, after evaluating the reasons for the separation, rested his ultimate conclusion upon the parents' continuing problems, the fragile nature of their home, and the severe emotional needs of J and A which called for an immediate and permanent solution.

In taking the extreme step of terminating the parents' legal rights, the judge was forced to decide "issues difficult to prove to a level of absolute certainty, such as lack of parental motive . . . and failure of parental foresight and progress," *Santosky* v. *Kramer,* 455 U.S. at 769.[13] His decision is entitled to defer-

---

that, before a decision on visitation could be made, a social worker would have to come to the home to determine if the family had made improvement. The required contacts between the parents and the social worker occurred and provided fresh evidence at trial on the current unfitness of the parents. While we approve the department's efforts to determine the appropriateness of visitation even after the filing of the petitions, we would expect in the future to see more initiative and diligence in such cases than shown here in periodically reassessing and encouraging the possibility of (1) visitation between parents and their children (and in particular requiring more current expert opinion than, as here, a 1976 opinion of the children's pediatrician that visitation would be harmful), and (2) securing therapeutic services for parents even if the parents are reluctant to accept the services.

[13] The Supreme Judicial Court has similarly noted that "[s]tandards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment. Underlying each case are predictions as to the possible future development of a child and these are beyond truly accurate forecast." *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption,* 385 Mass. 482, 489 (1982), quoting from *Petition of the New England Home for Little Wanderers,* 367 Mass. 631, 646 (1975).

ence because he was in "the best position to determine the weight of the evidence and the credibility of the witnesses." *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 389 Mass. at 802, quoting from *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption,* 385 Mass. 482, 488-489 (1982). We agree with the judge's conclusion that the parents are currently unable to provide the stable home and the care necessary to meet the special needs of J and A, and that the allowance of the petitions is in the children's best interests.

*Decrees affirmed.*