NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-1517                                      Appeals Court

ADOPTION OF ILIAN.[1]


No. 16-P-1517.

Bristol.      May 3, 2017. – June 28, 2017.

Present:  Kinder, Henry, & Desmond, JJ.


Adoption, Dispensing with parent's consent.  Minor,
    Adoption.  Parent and Child, Dispensing with parent's
    consent to adoption.  Practice, Civil, Findings by
    judge.  Department of Children & Families.



Petition filed in the Bristol County Division of the
Juvenile Court Department on August 23, 2013.

The case was heard by Siobhan E. Foley, J.


Matthew P. Landry, Assistant Attorney General, for the
Department of Children and Families.
    Abigail H. Salois, Committee for Public Counsel Services,
for the father.
    Diane Messere Magee for the child.


KINDER, J.  Following trial, a Juvenile Court judge found

that Ilian's parents were unfit to parent him and that

termination of their parental rights was in Ilian's best

---

[1] A pseudonym.

interests, and she accordingly issued decrees terminating their parental rights. See G. L. c. 119, § 26; G. L. c. 210, § 3. The judge approved a plan put forward by the Department of Children and Families (DCF) for Ilian's adoption by the foster family with whom he had been living for eighteen months. On appeal, the father claims error in the termination of his parental rights in light of his plan for a paternal cousin (cousin) to serve as Ilian's caregiver. The father contends that the judge failed to conduct an "even-handed assessment" of the two plans. We agree that the judge's assessment of the father's plan should have been more explicit. More detailed findings regarding the cousin's credibility as a witness and suitability as a caregiver would have clearly demonstrated the required even-handed assessment. Nevertheless, for the reasons that follow, we conclude that the judge adequately considered the father's alternative plan and properly concluded such placement was not in Ilian's best interests.[2] Accordingly, we affirm.

Background. We summarize the relevant facts, which have ample support in the record. Ilian was born in May, 2011, and was almost five years old at the close of the trial. DCF's first involvement with Ilian's family was in September, 2012,

---

[2] The mother is not a party to this appeal, having stipulated to the termination of her parental rights before trial.

when DCF received a report pursuant to G. L. c. 119, § 51A (51A report), for neglect, alleging that Ilian was present when the father shot a sixteen year old boy.  Ultimately, DCF's investigation did not support the claim that Ilian was present at the shooting.  However, the father was convicted of the underlying criminal offenses and sentenced to four to five years in State prison.  The father was incarcerated from the time of his arrest in 2012 through the termination of parental rights trial in the Juvenile Court trial in 2016.  At the time of the termination trial, his release date was uncertain.  There was no evidence that the father had ever been Ilian's primary caregiver.

After the father's arrest, the mother's life became increasingly unstable.  She was unable to maintain a home and lived with friends and in homeless shelters.  Eventually, the mother moved into an apartment with a woman who suffered from alcoholism.  In August, 2013, a second 51A report was filed after the mother and her roommate were involved in a violent altercation.  Each woman claimed to have been stabbed by the other.  The mother was arrested.  At the time of her arrest, the home was in a "deplorable" condition and Ilian was "filthy." DCF assumed temporary custody of Ilian and placed him with the maternal aunt.  At the time, Ilian was just over two years old

and was exhibiting developmental delays, including a profound speech problem.

DCF's initial plan to reunify Ilian with his mother was changed to adoption in February, 2014. In March, 2014, another 51A report was filed alleging neglect by the maternal aunt and, on DCF's investigation, the allegations were supported. In May, 2014, Ilian was removed from the aunt's home and placed in a residential program before being moved to a specialized foster home in July, 2014.

Ten months later, in May, 2015, Ilian was placed with an approved preadoptive foster family. At first, Ilian cried easily and had difficulty communicating. By the time of trial, Ilian was "thriving" and was able to engage in age-appropriate conversations. He was interacting well with the other children in the family. Ilian was described as "quite comfortable and well settled."

Prior to placing Ilian with his preadoptive foster family, DCF investigated several potential kinship placements. Two relatives were excluded because of their criminal records. The paternal grandmother was considered but then excluded after she failed to secure appropriate housing despite DCF's offer of assistance. The cousin was considered in May, 2014. She was informed by DCF that she would need an apartment with at least two bedrooms. The cousin next contacted DCF almost eighteen

months later, just prior to trial, indicating that she would like to be considered as a placement for Ilian. At the time of trial, the cousin was twenty-four and a single parent of an infant son. She worked forty hours per week as bus monitor. By that time, Ilian was well settled with his preadoptive family. The cousin had not seen Ilian since he was approximately fourteen to eighteen months old. In explaining the eighteen-month gap between her contact with DCF in 2014 and her contact just before trial, she testified at trial that she had lost the telephone number of Ilian's case worker, was caring for her own son, and needed "to get my own self situated before I even did anything else."

Discussion. 1. Termination of the father's parental rights. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). Such a finding must be supported "by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). See Adoption of Mary, 414 Mass. 705, 710-711 (1993). "We give substantial deference to a judge's decision . . . and

reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Ilona, supra.

Here, the father does not contest the evidence of his unfitness. He claims, however, that the decree terminating his parental rights was error in light of his nomination of the cousin as a suitable kinship placement for Ilian. He also argues that certain factual findings were clearly erroneous. After a careful review of the record, we conclude that, with two exceptions discussed below, the judge's subsidiary findings of fact were supported by a preponderance of the evidence, and there was no error of law or abuse of discretion in her conclusion that termination of the father's parental rights was in Ilian's best interests.

The father assigns error to a number of the judge's factual findings. In large part, however, his arguments challenge the way in which the judge weighed the evidence. On such matters we defer to the trial judge. See Adoption of Stuart, 39 Mass. App. Ct. 380, 382 (1995) ("[D]eference is to be accorded the trial judge's assessment of the credibility of witnesses and the weight of the evidence"). There were two findings, however, that lacked evidentiary support. First, there was insufficient evidence to support the judge's finding that the father was aware of Ilian's possible autism diagnosis prior to his

incarceration. However, the father admitted that he knew about the possible diagnosis at least by October, 2013, and failed to pursue services for Ilian. Second, there was no evidence that the cousin's two-bedroom apartment was inadequate at the time of trial. However, it is undisputed that the cousin had not seen Ilian for several years. The cousin admitted that she failed to stay in contact with DCF for eighteen months after she first volunteered to care for Ilian and that she was unable to secure adequate housing during that time. By then Ilian was settled in a stable environment with his preadoptive family. Considering these two erroneous findings in the context of all of the evidence, we cannot say that the judge abused her discretion or committed clear error in the ultimate decision to terminate the father's parental rights. See Care & Protection of Olga, 57 Mass. App. Ct. 821, 825 (2003) (ultimate conclusion of unfitness supported where errors not central to ultimate conclusion).

2. Assessment of plans. Under G. L. c. 210, § 3, there are two considerations in determining whether termination of parental rights is in the child's best interests. First, the judge must consider the "ability, fitness, and readiness of the [child]'s parents to assume parental responsibility." Adoption of Vito, 431 Mass. 550, 568 n.28 (2000). Second, the judge must review "the plan proposed by [DCF]," ibid., with equal consideration given to any competing plan proposed by a parent.

See G. L. c. 210, § 3(c); Petitions of Dept. of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. 120, 124 n.11 (1984). "[T]he judge must assess the alternatives and, if both pass muster, choose which plan is in the child's best interests, however difficult that choice may be." Adoption of Dora, 52 Mass. App. Ct. 472, 475 (2001). "In choosing among placement plans, it falls to the sound discretion of the trial judge to determine what is in the best interests of the child, and our review on appeal is one of substantial deference." Adoption of Bianca, 91 Mass. App. Ct. 428, 434 (2017) (quotation omitted). Here, the father contends that the judge did not adequately consider the father's plan to have the cousin act as Ilian's caregiver.[3] We disagree.

DCF proposed, and the judge approved, a plan under which Ilian would be adopted by his preadoptive foster parents. There is no dispute that Ilian was thriving in that placement. The judge found that Ilian "interacts well with the other children in the home," that he is "comfortable with his pre-adoptive parents," and that he "runs to [the] foster mother . . . and displays affection towards her." See Adoption of Nicole, 40 Mass. App. Ct. 259, 262-263 (1996) (bonding between child and

---

[3] We note that placement with the cousin was the last of a number of family placements considered by DCF. The father does not challenge DCF's rejection of the other three family members as suitable caregivers.

preadoptive parent is factor to be considered). Significantly, under the care of the preadoptive foster parents, Ilian's speech had improved dramatically. See Adoption of Ilona, 459 Mass. at 62 (no abuse of discretion in terminating parental rights where child demonstrated "extraordinary progress" when removed from mother and placed with foster parents).

The judge's assessment of the father's plan for the cousin to act as caretaker was less explicit, but she did make findings related to the cousin's suitability. The judge found that "[i]n May of 2014, Father's cousin . . . contacted [DCF] to be considered for placement. [She] had a one bedroom apartment and was advised that she would need a two bedroom." The judge further found that "[i]n November of 2015, [the cousin] informed [the adoption social worker] that she was still living in a one bedroom apartment but was soon to secure a two bedroom. [The cousin] had not seen [the child] since he was approximately 14-18 months of age. He is now 5 years old." However, the findings did not reflect that the cousin had secured a two-bedroom apartment by the time of trial, as DCF required, and had successfully completed a home study as ordered.

We are mindful that the judge heard extensive trial testimony from the cousin explaining her relationship with Ilian, her personal circumstances, and her absence from Ilian's life. The judge was in the best position to weigh that

testimony.  Although the better practice would have been for the judge to make explicit findings of fact from which we could determine her assessment of the cousin's credibility at trial and her suitability as Ilian's caregiver, we think it is implicit in the findings she did make that she considered placement with the cousin and concluded such placement was not in Ilian's best interests.  In these circumstances, where the child was thriving in a stable environment with the preadoptive foster parents, and the economic and emotional stability of a placement with the cousin was uncertain, the judge acted well within her discretion in concluding that Ilian's best interests were served by DCF's plan that Ilian be adopted by his preadoptive foster parents.[4]

<u>Decree affirmed</u>.

---

[4] "Other points, relied on by the [father], but not discussed in this opinion, have not been overlooked.  We find nothing in them that requires discussion."  <u>Commonwealth</u> v. <u>Domanski</u>, 332 Mass. 66, 78 (1954).