NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1496

ADOPTION OF LEAH.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a Juvenile Court decree terminating his parental rights.[2]  He argues that the Department of Children and Families (department) failed to prove that he was unfit, that any unfitness was temporary and did not support termination of his parental rights, and that the department did not make reasonable efforts to reunify him with the child.  We affirm.

Background.  The child was born on August 12, 2020.  A day later, a report under G. L. c. 119, § 51A, was filed against the mother and her husband (husband), alleging among other things that the child tested positive for cocaine and methadone at birth.  The report was screened in for an emergency response,

---

[1] A pseudonym.

[2] The mother's parental rights were also terminated, but she did not appeal.

and the department opened an investigation under G. L. c. 119, § 51B.  On August 14, 2020, after finding the allegations to be supported, the department filed a petition for emergency custody, which was allowed the same day.  The mother and the husband later waived their rights to a temporary custody hearing.

The mother did not initially disclose to the department that the father (who is the husband's uncle) might be the child's biological father.  But a few days after the emergency custody hearing, the mother told a social worker that the father is the biological father.  A judgment of paternity adjudicating the father as the child's father then entered in late December 2020.  In January 2021 the father was granted a temporary custody hearing, after which a judge (hearing judge) ordered that custody remain with the department.  The hearing judge found that the father knew that the mother was using drugs while pregnant with the child (and with her three older children), that he denied the mother's drug use despite learning of her positive screen, and that he had no concerns about the mother's parenting.  Based on these findings, the hearing judge expressed that she had "little confidence that [the] [f]ather will maintain boundaries with [the] [m]other in order to keep the child safe."

Meanwhile, in November 2020, the department created an initial action plan, which identified the father as the child's father.  The father's tasks included completing parenting classes, maintaining a home free of substance abuse, visiting with the child consistently, and attending foster care reviews and following through with recommendations.  During the course of the proceedings, additional tasks were added to the father's action plan, including completing a parenting assessment, providing proof of stable housing and finances, and allowing the department to conduct unannounced visits to his home.  By the time of trial, the father had not complied with most of these tasks.

The father missed seventeen visits with the child and repeatedly ended visits early.  During the visits he did attend, the father often failed to engage with the child and displayed a limited understanding of basic parenting skills.  On several occasions social workers observed that the father did not speak to the child much throughout the duration of the visit and had to be told to get off his phone and engage with her.  The father did not know how to properly hold the child.  He also repeatedly had to be reminded to wipe the child's nose, soothe her when she threw tantrums, and check her diaper, and he had to be directed to put on her boots and pick up her cup from the floor after it

fell. On other occasions the father failed to stop the child from touching electrical outlets, putting choking hazards in her mouth, standing on chairs, and running out the door. Once when the child threw her bottle in the trash, the father gave it back to her while stating, "[I]t might taste funny," and had to be told to sanitize the bottle first. When the father was reminded multiple times that the child was then wearing pull-ups, he continued to bring diapers.

The father also displayed a lack of understanding of the child's medical needs. The child was hospitalized for several weeks after her birth and had ongoing medical issues, including asthma, difficulty tolerating foods, and neurological issues such as jerky movements, muscle spasms, blank and unresponsive staring, and tremors. The father was often unaware of the foods that the child could not tolerate and, when reminded of her restrictions, stated that he was "allowed to bring anything [he] want[ed] for her" because she is his daughter. The father never administered the child's inhaler for her asthma. When he learned that the child was still suffering from tremors and blank staring, the father stated that she was "just like her mother" and was having "blonde moments."

The father's home raised additional concerns related to the child's medical needs and wellbeing. During an initial home

visit in September 2020, a social worker observed that the father's apartment, which was in the basement, was unclean, had an odor, and contained mold and opened bottles of bleach. The father moved out of the basement apartment in December 2021 to another apartment in the building, where he was still living when trial occurred. During a home visit in February 2022, a social worker observed that the new apartment was cold, smelled moldy, and contained a pile of trash in the living room. During a home visit the next month, the social worker observed that the pile of trash remained, with the addition of "sticks, leaves, and other items." The apartment was still cold, smelled strongly of cigarettes, and, in the room that would be the child's room, contained miscellaneous items strewn about and a "toddler bed in the middle" surrounded by storage items. The social worker saw no improvement during a May 2022 home visit, noting that the apartment smelled of cigarettes, body odor, and mildew. The father also repeatedly cancelled home visits and did not respond to unannounced visits, preventing the department from conducting any visits during the pendency of the trial.[3]

Despite his parenting deficits, the father did not complete

---

[3] The first two days of trial occurred in August 2022. After the department moved to reopen the evidence, a third day of trial occurred in February 2023. The social worker testified at that time that she had been unable to conduct a home visit since she testified in August 2022.

a parenting assessment or a parenting class.  The social worker tried to help the father enroll in parenting classes, but the father believed he did not need them.  Although the father was invited to the child's medical appointments, he attended only one, arrived late, did not engage with the child or redirect her when needed, and asked no questions about her medical condition, including her struggle to gain weight.  The father also refused to provide proof of his income.  Although he was self-employed as a mechanic and welder, he testified at trial that he was then working only "small jobs that come and go" and had recently "take[n] a break" from work altogether.  When asked how he would provide for the child, the father claimed to have enough savings to last six to seven months but refused to provide any documentation.

The mother continued to use substances while the case was pending and in November 2022 gave birth to a fourth child (son), who tested positive for cocaine, marijuana, opiates, methadone, and fentanyl.  The father was identified as the putative father. The department later learned that the mother had given birth to the son in the father's apartment.  When told that the son was born substance exposed, the father replied, "[W]ow."  The father claimed to have been unaware that the mother was using substances during her pregnancy and stated he could not control

what she does when he is not around.  Although the department received conflicting reports during the proceedings about whether the mother and father were still together, the father testified that "if not for the [department's] involvement, he would be in a relationship with [the] [m]other."  When asked at trial how much access the mother would have to the child should he be granted custody, the father replied that it would depend on whether the mother was "clean or using."  He admitted, however, that he could not tell when the mother was under the influence of crack cocaine or heroin and said he would take her "at her word" because she "had no reason to lie."  He further testified that, when the mother is using, she "acts like a child, has mood swings, [and] has temper tantrums."

At the time of trial, the child was two years old and living in a preadoptive home.  The preadoptive mother, who is the father's step-niece, was the only foster parent the child has had since birth.  During a video conference, the court investigator observed the child being "snuggly" with the preadoptive mother, whom the child called "mom."  The child continued to have ongoing health issues and was seeing a pulmonologist, an ear, nose, and throat specialist, and a gastroenterologist.  She was also seeing a behavioral therapist and a behavioral therapeutic mentor and was enrolled in

occupational and speech therapy. The preadoptive mother was consistent about taking the child to her frequent medical appointments. The child's service coordinator opined that the child's caretaker will "require[] some special skills and patience and knowledge of her background and needs to properly care for her."

Discussion. 1. Unfitness. "To terminate parental rights to a child and to dispense with consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). See Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 389 Mass. 793, 800 (1983) (child's particular needs should be considered when determining whether parent is unfit).

Here, the trial judge (who was different from the hearing judge) made detailed findings that demonstrate by clear and convincing evidence that the father was unfit to parent the

child. At the time of trial, the child had ongoing, complex medical needs. The father attended only one of the child's medical appointments, arrived late, and showed disinterest in learning about her medical condition. He dismissed the child's neurological issues as "blonde moments," did not learn how to administer her inhaler, and displayed a disregard for her food restrictions. Moreover, even aside from the child's medical needs, the father displayed an inability to parent a child of her young age and temperament. He missed numerous visits and often did not engage with the child when he did attend. He failed to protect the child from common safety risks, such as electrical outlets and choking hazards, and had to be instructed to wipe the child's nose, check her diaper, and put on her shoes. In addition, the judge credited the testimony of the child's service coordinator that the child's "sensitivities" and "temperament require careful attention and knowing her [cues]," yet the father was disengaged during visits and failed to console the child when she threw tantrums. The father's lack of understanding of the child's medical and emotional needs, and his disinterest in educating himself about them, supported the judge's finding that he was unfit. See Adoption of Jacques, 82 Mass. App. Ct. at 608 (unfitness finding supported by mother's "limited understanding" of child's medical diagnoses and "her

repeated unwillingness and procrastination in seeking services that would assist her in understanding his special needs").

The evidence of the father's home environment further supported the trial judge's decision. During home visits in February and March of 2022, the social worker observed unsanitary conditions in the father's apartment, which did not materially improve by the home visit in May 2022. Furthermore, the father repeatedly canceled home visits, which prevented the department from viewing his apartment during the pendency of the trial. "The cleanliness of a parent's home is an appropriate factor for consideration in determination of that parent's fitness." Care & Protection of Vick, 89 Mass. App. Ct. at 706.

Contrary to the father's argument, the trial judge could also consider the father's relationship with the mother, who had serious and ongoing substance abuse issues. The trial judge did not "impute[]" the mother's unfitness to the father, as the father contends. Rather, the trial judge concluded that the father was "unable or unwilling to set appropriate boundaries" with the mother, which "is contrary to [the child's] safety." This conclusion is supported by the evidence. The trial judge found that the father maintained frequent contact with the mother, and the father's own testimony showed that he planned to continue a relationship with her. In addition, the father

planned on giving the mother access to the child even though, by his own admission, he could not always tell when the mother was using substances and she exhibited volatile behavior when she was using them. The trial judge could consider the father's minimization of the mother's substance use, and his inability or unwillingness to set boundaries with her, as evidence that the child would be at risk if placed in his care. See Adoption of Lisette, 93 Mass. App. Ct. 284, 293-294 & n.15 (2018).

All of this evidence, together with the father's failure to engage in services, clearly and convincingly established that he was unfit.[4] We disagree with the father's characterization of the trial judge's decision as based on the father's "perceived eccentricities." The trial judge's conclusions of law reflect that he based his decision on the evidence of the father's lack of understanding of and inability to address the child's special needs, his unsuitable home environment, his relationship with

---

[4] As the department concedes, one of the trial judge's findings -- that the father had not worked in the nearly two years leading up to trial -- is inconsistent with the father's testimony, which was that he worked twenty-five to thirty hours per week during that period. But later in his conclusions of law, the trial judge accurately states that the father had "not worked full time in at least a year and a half." Moreover, it is uncontested that the father had stopped working altogether shortly before trial and that he refused to provide any proof of his income or the savings that he said he would use to support the child. Thus, to the extent there was error, we conclude it was harmless. See Adoption of Peggy, 436 Mass. 690, 702 (2002).

the mother, and his failure to address these issues by engaging in services -- all permissible factors. We are also unpersuaded by the father's contention that the trial judge shifted the burden of proof to him to prove his fitness. The father points out that he was not named as a respondent on the emergency custody petition or identified as a perpetrator of abuse or neglect of the child. But the father was added to the case once adjudicated the biological father, and the trial judge correctly stated in his decision that the department had the burden of proving the father's unfitness by clear and convincing evidence. The father points to nothing in the decision that suggests that the trial judge shifted the burden of proof to him.

2. Termination. The evidence further supported the trial judge's finding that termination of the father's parental rights would be in the child's best interests. Before terminating parental rights, "a judge must decide both whether the parent is currently unfit and whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary.'" Adoption of Ilona, 459 Mass. 53, 59 (2011), quoting Adoption of Carlos, 413 Mass. 339, 350 (1992), S.C., 413 Mass. 339 (1992). "We give substantial deference to a judge's decision that termination of

a parent's rights is in the best interests of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, supra.

The trial judge did not abuse his discretion by finding no reasonable likelihood that the father's unfitness was only temporary. As the trial judge explained, the father "failed to address the issues raised by the [d]epartment regarding his ability to properly care for" the child. The father did not take a parenting class or complete a parenting assessment at any time during the pendency of the case, did not gain any meaningful understanding of the child's special needs, failed to improve his home environment, and continued his relationship with the mother and had another child with her, while denying or minimizing her substance use. The trial judge did not ignore evidence of the father's positive parenting during visits, as the father argues. To the contrary, the trial judge found that the father was "loving and appropriate" with the child during one visit and that he "often played with blocks or toys on the floor" with the child. The trial judge also found that the child had started to bond with the father and entered a postadoption visitation order allowing the father two supervised visits per year. The trial judge could still conclude in his

discretion, however, that this positive evidence did not outweigh the other evidence showing that the father's unfitness was not temporary. See Custody of Two Minors, 396 Mass. 610, 618 (1986) ("judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference").

The trial judge was also within his discretion to find that the department's adoption plan was consistent with the child's best interests. See Adoption of Helga, 97 Mass. App. Ct. 521, 527-528 (2020) (termination inquiry requires judge to consider plan proposed by department). The child was placed directly into the care of her preadoptive mother, a kinship placement, and developed a bond with her. The preadoptive mother was meeting all of the child's needs and was open to facilitating contact with both biological parents. Considering the totality of the evidence, we see no abuse of discretion in the trial judge's determination that the child's best interests would be served by terminating the father's parental rights.

3. Reasonable efforts. "When committing a child to the custody of the department or terminating parental rights, a judge must determine whether the department has complied with its duty to make 'reasonable efforts . . . to prevent or eliminate the need for removal from the home.'" Adoption of Ilona, 459 Mass. at 61, quoting G. L. c. 119, § 29C. "A judge's

determination that the department made reasonable efforts will not be reversed unless clearly erroneous." Adoption of West, 97 Mass. App. Ct. 238, 242 (2020).

In challenging the trial judge's finding that the department made reasonable efforts, the father focuses not on the evidence presented at trial, but on two orders issued by the hearing judge at early stages of the case. First, the father argues that the hearing judge erred as a matter of law in concluding, after the temporary custody hearing, that "where [the] [f]ather was putative and [the] [m]other was married to another person, . . . no reasonable efforts were needed [regarding the father] at the time the [d]epartment was granted custody of the child." We see no error. The department was granted emergency custody of the child on August 14, 2020. At that time the mother had not disclosed to the department that the father, and not her husband, might be the child's biological father. To the extent the father argues that the department should have placed the child with him once it later learned he is the biological father, that argument is subsumed within the hearing judge's order after the temporary custody hearing. As mentioned, the hearing judge ordered that temporary custody of the child remain with the department, finding a risk that the

father might not maintain boundaries with the mother to keep the child safe.

Next, the father challenges the hearing judge's June 9, 2021 order on the father's motion to require the department to make reasonable efforts to reunify him with the child. Specifically, the father argues that the hearing judge erred as a matter of law in concluding that the "matter is more appropriately done at a permanency review hearing pursuant to G. L. c. 119, § 29B and/or at a hearing on the merits."[5] The father claims that this was error under Care & Protection of Rashida, 488 Mass. 217, 233 (2021), but that decision was issued more than two months after the hearing judge ruled on the father's motion. As the father did not refile his motion or move for reconsideration, his argument is waived. See Adoption of Willow, 433 Mass. 636, 651 (2001).

All this aside, it is unclear what relief the father is requesting from the hearing judge's orders now that the matter has gone to trial. By the time of trial, the department had accommodated the requests made by the father in his June 2021 motion, including that he be allowed visits with the child without the mother present and that he be allowed to attend the

_____

[5] Despite this statement, the hearing judge still ordered the department to address some of the father's concerns.

child's medical appointments. The only services the father now claims the department did not provide are "psychoeducation about substance use disorder" or a referral "to a group for people with a family member who struggled with substance use disorder." But the father did not raise this claim below, so it is waived. See Adoption of Gregory, 434 Mass. 117, 124 (2001). In addition, the department's duty to make reasonable efforts was contingent on the father's fulfilling his own responsibilities to engage with services, which he failed to do. See Adoption of Eduardo, 57 Mass. App. Ct. 278, 281-282 (2003).

Finally, even where the department fails to make reasonable efforts, "a trial judge must still rule in the child's best interest." Adoption of Ilona, 459 Mass. at 61. A determination that the department failed to meet its obligation "'shall not preclude the court from making any appropriate order conducive to the child's best interest,' including termination." Adoption of Darlene, 99 Mass. App. Ct. 696, 710 (2021), quoting Adoption of Ilona, supra. Here, for the reasons above, the trial judge

properly found that termination of the father's parental rights would serve the child's best interests.[6]

Decree affirmed.

By the Court (Sacks, Shin & Hershfang, JJ.[7]),

Clerk

Entered:   December 11, 2024.

---

[6]  "Despite the moral overtones of the statutory term 'unfit,' the [trial] judge's decision was not a moral judgment or a determination that the mother and father do not love the child.  The inquiry instead is whether the parents' deficiencies or limitations 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.'" Adoption of Bianca, 91 Mass. App. Ct. 428, 432 n.8 (2017), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

[7] The panelists are listed in order of seniority.