ADOPTION OF GREGORY & others.* November 6, 1986. *Adoption,* Dispensing with parent's consent. *Due Process of Law,* Adoption. *Parent and Child,* Custody of minor. *Minor,* Care and protection. *Collateral Estoppel.*

We affirm decrees of the Probate Court for Plymouth County which, at the suit of the Department of Social Services (Department), declared pursuant to G. L. c. 210, § 3, that the consent of the parents, the Johnsons (not their real name), is not required in connection with any petition for the adoption of their three children, whom we shall call Gregory, Christine, and Renee.

As is so often the case in proceedings of this sort, the record is lengthy and some of it is diffuse. We attempt a short account of the case; then go into some further detail; and finally deal with the contentions of the parents, the appellants.

1. *Statement.* Upon a petition alleging that the children were in need of care and protection (see G. L. c. 119, § 24), a judge of the Brockton District

---

* This decision originally appeared as an order under rule 1:28 sub nom. *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption.* See *post* 1102 (1986). — REPORTER

Court on June 21, 1979, entered an order granting temporary custody of the children to the Department of Social Services (then the Department of Public Welfare).[1] Gregory was then seven years old; Christine, six; Renee, five. The Department placed the children with their paternal grandparents. After about a year, the grandparents stated they were unable to continue to care for the children, and apparently they expressed the view that the children should be taken for adoption. A social worker of the Children's Protective Service applied for an order granting "permanent" custody to the Department, and the court, after receiving a report from the court-appointed investigator and hearing evidence, granted the order on July 1, 1980. The judge made findings of parental incompetence and abuse resulting in serious damage to the children, and concluded that the children required an environment which the parents were unable to provide.

The Department placed the children with the Italian Home for Children (IHC) in Jamaica Plain, Boston, in August (Christine and Renee) and September (Gregory), 1980. This residential treatment facility, with which the Department contracted for services, housed at the time some forty disturbed children who (typically) had suffered from parental maltreatment of various sorts. IHC undertook to try to rehabilitate the children to the point where they could be considered for release either to the parents, assuming the home situation could be sufficiently improved, or to suitable foster homes. The record allows the inference that, taking account of what appeared at the time of intake about the condition of the children and the disabilities of the parents, the people at IHC proceeded at first on the basis (perhaps not squarely articulated) that the children, if and when sufficiently rehabilitated, would be tendered for adoption and not returned to their parents, since adequate improvement in the latter direction was not to be expected. The record further suggests that, conformably with that view, there was no defined program in the early months for visits by the parents with the children at IHC, although the parents were permitted such (supervised) visits. Nor does there appear to have been a defined program, either on the part of the IHC or the Department, for counseling or other work with the parents with a purpose, if possible, to reunite the family.

The situation was markedly changed after a meeting in February, 1981, with counsel for the Department.[2] As the meeting can be reconstructed, counsel advised, in effect, that there should be no assumption that the parents' disabilities excluded any reasonable likelihood of their regaining custody of the children; on the contrary, IHC and the Department should make definite efforts to assist the parents to overcome their disabilities, these efforts to proceed alongside the attempts to help the children. The workers at IHC established accordingly a schedule for the parents' visits at IHC, and representatives of IHC and the Department commenced meetings

[1] The experience of the family from 1975 onward is referred to at point 2 (a) below.

[2] At the time there was uncertainty at IHC whether a c. 210 petition had been filed.

on a regular basis with the parents to counsel them about their "parenting" problems and to encourage them to join programs in the community that could afford them practical lessons to overcome these problems. In September, 1981, the parents endorsed a "service plan" prepared by the Department which, after recounting some of the deficiencies found in the parents' attitudes and performance, outlined the cooperative efforts expected of them that might lead to a favorable evaluation and avert their losing the children to adoption. As of January 29, 1982, we have an important "Diagnostic Evaluation" by Linda S. Garnitz of IHC which pictures the still unresolved inadequacies of the parents and the improved, yet still fragile conditions of the children. In March, 1982, the present proceeding was filed. However, visits with the children and counseling remained available to the parents.

The record indicates that in mid-December, 1982, Gregory and Renee went from IHC to a preadoptive home; their sister Christine, a more aggravated case, was released to a different preadoptive home in February, 1983.

The present proceeding came on for trial in March and September, 1983, and findings of fact, rulings of law, and decrees favorable to the Department were filed on October 31, 1983. The guardian ad litem had advised the court to the same effect. The parents took their appeal, but after the record was assembled the Department moved to amend the findings and rulings and to take further evidence. This formed the basis for a "review hearing" of October 23, 1985, after which the judge made findings of fact dated December 2, 1985. These reaffirmed his earlier findings of parental unfitness and his conclusion that parental consent to adoption should not be required. The parents have appealed on the enlarged record.

2. *Further detail.* We draw a more detailed picture from the judge's findings as amplified from the extended record.

(a) *Care and protection.* The mother's cousin, a nurse, complained in 1975 that Renee had been neglected. This resulted in the child's hospitalization. From 1975 onward the Department received a number of substantiated reports that the children were suffering physical and emotional abuse at the hands of the mother.[3] She resisted the attempts by various agencies to provide help to the family, was openly hostile to the workers, missed appointments with them, and so forth. The care and protection application followed, ending in the temporary order of June 21, 1979. The findings which supported the permanent order of July 1, 1980, confirmed by particular instances that the mother had maltreated the children both physically and verbally, with Christine perhaps suffering the most serious abuse. The father figured as a cipher in the household and could not be looked to for

---

[3] The ongoing situation can be gathered from a "Direct Service Summary, June 1975-August 1981," of the regional office of the Department, and from a "Summary" of June 21, 1979, by Virginia M. Lutz, the social worker who acted as petitioner in the application for permanent custody. The parents refer to a "closing" of the case around November, 1978, by a social worker, Kevin Farrell, but the closing was evidently incorrect.

intervention or remedy. Concluding his findings, the judge recommended long-term treatment in a supportive and stable setting. IHC provided just such an environment, and the record indicates that the workers there concentrated medical, psychological, and educational attention on the children in a conscientious and impressive way.

(b) *Condition of the children.* Some idea of the children's basic characteristics follows. Of the three, Gregory was perhaps nearest "normal." He had above average intelligence, but was having trouble functioning mentally because of his emotional difficulties, which interfered with his ability to fix on a problem without his mind wandering. He was highly anxious as a result of his unstructured and ambiguous family life. The anxiety manifested itself in hyperactivity. One psychological report said of him that he seemed "a boy who is crying out for some rational, supportive external controls."[4]

Renee's intellectual functioning was within the "borderline range." In testing, she saw her environment as "threatening, hostile and dangerous with parental figures depicted in a harsh manner."[5] She identified with children in "abusive and neglected situations."[6] She had feelings of depression and sadness which manifested themselves in agitated behavior. Her attention span was short and she had "a poorly developed sense of impulse control."[7]

Christine was severely disturbed emotionally, "a frightened, regressed, confused girl whose perception of other people is horrifying to her."[8] Her test results suggested that she came from a "chaotic, unpredictable setting and lacks basic trust."[9] Her emotions invaded her thinking and confounded for her the difference between fantasy and reality. She wet and soiled her bed without physiological cause. (As late as March, 1982, Christine, during a crisis with another child, took a bottle of Mellaril from an unlocked medication cabinet and swallowed an undetermined number of pills. She was taken to Faulkner Hospital and treated there for an overdose. This episode suggested a suicidal impulse.)

There was favorable development in the three children in varying degrees over the period of their stay at IHC. As a means of testing whether they were ready for release to preadoptive homes, they made visits to a home where their reactions to the new experience could be observed. The diagnosis was favorable. IHC concluded that the children should be placed, and this occurred prior to the 1983 hearing.[10] Nevertheless, the underlying problem of these children remained, even if with diminished acuteness.

---

[4] See finding 8C of October, 1983.

[5] *Id.*, at finding 8A.

[6] *Ibid.*

[7] From "Diagnostic Evaluation."

[8] Finding 8B of October, 1983.

[9] *Ibid.*

[10] The qualifications of the preadoptive parents were attested to by reports of IHC.

What ran through each of these three cases, as discerned originally by the judge who awarded permanent custody, was a need for a stable, steadying environment. In such a setting calculated attention could be given to finding answers to the child's particular problems.

(c) *Condition of the parents.* We pursue on the record the question whether the parents (with the father making no, or a negative, contribution) could be depended upon to create and maintain such a stable atmosphere. It is suggestive that the parents had a bad record of performance in the program that was set up after February, 1981, for visits with the children at IHC. "They were inconsistent in their visits and negative in the manner in which they treated the children during the visits that did take place." [11]

Also quite disappointing were the parents' responses to the program of counseling which, they knew, would be important indicators of their desire and ability to resume "parenting." The history of these encounters can be summarized in the words of the introduction to the service plan of September 10, 1981, which refers to the mother's "ability to manipulate agencies out of her life with aggressive and hostile behavior."

Thus no progress could be reported. The judge's 1983 findings underscore the substance of the estimate of the parents that can be found in the "Diagnostic Evaluation." The parents could not comprehend the individual needs of their children; they could not separate or distinguish their own needs from those of the children. They could not handle stress or act toward the children with consistency. There had been hope that the parents would come to acknowledge their errors or infirmities as a step toward correcting them. On the contrary, they did not accept that there was any reason for the removal of the children. They foisted the blame for their troubles on the social workers and psychologists and felt they were justified in all they had done. "There appeared to be nothing further that anyone could do to help the parents . . . since they were hostile and negative toward every effort to assist or advise them prior to and during the long period of separation from the children." [12] The judge found support for these dismal recitals in the testimony of the mother at the hearing, where she blamed neighbors for contriving at the care and protection proceedings, exaggerated an episode when she was supposedly attacked by neighbors, and described her taking librium (secured by prescription) from 1978 to sometime in 1983 so that it appeared as a crude means of trying to cope with her own anger and unpleasant situations that would otherwise overwhelm her.

Considering what would be the effect of returning the children to the parental ambience (as above described), those who worked with the children believed that the children would suffer "massive regression." [13] (It may be

---

[11] Finding 10 of October, 1983.

[12] Finding 11 of October, 1983.

[13] See finding 12 of October, 1983, referring to testimony of Garnitz at the hearing. (It is acknowledged that where the parents are not unfit, allowance of a petition to

noted in this connection that all the children, and Christine most of all, had reacted poorly after visits with the parents at IHC.)

(d) *Guardian's view.* Matthew E. Sullivan, guardian ad litem, reported to the court prior to the hearing in September, 1983. He had read and evaluated the department's records and had talked with the parents and Gregory and Renee; he had not seen Christine. He recalled the depleted condition of the children before the Department assumed custody, Christine being the most seriously damaged. Gregory, he thought, had made "tremendous gains." Gregory and Renee told the guardian "they wanted the stability of a permanent home." He noted that the mother appeared unable to respond to stress and had a long history of hostility toward the workers who offered help. After much soul searching, the paternal grandparents felt the petition should be allowed.[14] The guardian concluded that the best interests of the children would be served thereby.

(e) *Findings and rulings.* In his findings and rulings of October 31, 1983, the probate judge found clear and convincing evidence leading to the conclusion that the parents had neither past nor present fitness to assume responsibility for the children and that the best interests of the children would be served by dispensing with the parents' consent to subsequent adoption.[15] Two years later, the judge at the renewed trial heard testimony about the current condition of the children,[16] as well as testimony by the mother. The judge's findings may be summarized as follows. Gregory (fourteen years old at the time) "appeared to have the most difficulty in the preadoptive placement because of a lack of emotional attachment between [himself] and his preadoptive family."[17] He was noncommunicative and was avoiding peer relationships. Accordingly Gregory commenced counseling therapy in May, 1984. In recent months, however, the therapist noted improvement in Gregory's attitude and feelings toward his preadoptive parents. He was maintaining peer relationships outside the home. His academic performance improved. The judge found little that assisted him in making a current assessment of Gregory's status or needs, but, considering

---

dispense with their consent may not be justified by the mere finding that the children would be hurt by being returned to the parents. See *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption,* 391 Mass. 113, 119 [1984].)

[14] On December 7, 1982, the parents told the guardian they were willing to have the paternal grandparents adopt the children. "However, they changed their minds about that plan and another in which [the mother] stated they were thinking of releasing the children."

[15] For the Department, there was testimony by the clinical social worker, Garnitz, and a case worker, Deborah E. Brown, with the introduction of many exhibits. The parents testified but offered no expert opinion.

[16] Testimony was given by Dr. Susan Slattery, psychologist; Barbara Crivellaro, Christine's special needs teacher; and Barry Giordano and Rachel Palazzini, Gregory's social worker and guidance counselor.

[17] The second paragraph of December, 1985, findings concerning the son.

the entire record, he thought the prior disposition should stand as it related to this child.

As to Renee (eleven years old) there was no evidence about her relationship with her preadoptive parents, but other evidence was markedly positive. Coming into her special education class withdrawn from other children and educationally much retarded, she was now considerably improved in both respects. Renee "became an active participant in all school events and an anxious and willing helper to her friends at school." [18]

Christine (twelve and one-half years old), "the most severely traumatized during her years with her parents[,] remains today in a very delicate situation with a preadoptive family." [19] She expressed fear of her mother, who "hurt her and hit her," and said about her father, "He didn't help me, but he didn't hurt me." [20] Christine would continue to need therapy for some years, but her behavior had become less violent or uncontrolled, and she had improved her school performance and her relationships with her peers and others. She had a strong feeling for her preadoptive parents who were, if anything, too protective toward her. The judge, agreeing with Christine's psychologist, found that "any move back to her family would trigger regression that would be severely damaging to her and to their future." [21]

The mother testified that she and the father were employed. She had not been involved in counseling of any kind or with any "parenting" groups since 1983: she wouldn't know where to find such groups. The judge recalled the many efforts to help these parents which they had rejected.

As indicated, the judge held to his prior disposition regarding all the children.

3. *Contentions.* On the face of the whole record, there was clear and convincing evidence that the parents were currently unfit to serve the best interests of the children; their consent to future adoption could therefore be dispensed with. See G. L. c. 210, § 3 (c); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. 793, 799 (1983). See also *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 20 Mass. App. Ct. 689, 694-695 (1985) (necessity of current assessment). The judge's findings on these propositions were not plainly wrong and must be respected upon appellate review. See *Petition of the New Bedford Child and Family Service to Dispense with Consent to Adoption*, 385 Mass. 482, 488-489 (1982). Cf. *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 645 (1975).

---

[18] Third paragraph in December, 1985, findings concerning the younger daughter.

[19] First paragraph in December, 1985, findings concerning the older daughter.

[20] *Id.*, fifth and seventh paragraphs.

[21] *Id.*, eleventh paragraph.

(a) *Question of presumption.* It is argued, however, that the judge mistakenly relied on the "presumption" part of G. L. c. 210, § 3 (c). This was a presumption that where a child had been in the care of the Department for more than one year, its best interest would be served by a judgment dispensing with the need for parents' consent to adoption. The presumption had been held unconstitutional in *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. at 802-803. It is true that the judge referred to the presumption in two paragraphs of his rulings of law of October, 1983, but he went on, " [n]otwithstanding the above," that is, apart from the presumption, to make the rulings on parental unfitness and children's best interests. We observe that if the judge had actually based his decision on the presumption, there would have been no need for the renewed hearing in 1985 which, incidentally, resulted in findings that did not refer to any presumption. In our opinion, finally, the record supports the necessary conclusions without any crutch of presumption.

(b) *Effect of care and protection decision.* In his findings recounting the family history, the probate judge acknowledged the earlier findings of the judge of the Brockton District Court supporting the award to the Department of permanent custody of the children. Curiously, there is argument that these earlier findings were inadmissible "hearsay." On the contrary, they represent adjudications binding on the parents. In the earlier proceeding, as in the present, the parents confronted the Department;[22] the court found against the parents on issues essential to decision; the parents had a right of appeal which they failed to exercise. Thus the parents were bound in the present proceeding by "issue preclusion" ("collateral estoppel"). See Restatement (Second) of Judgments § 27 (1980); *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. 707, 710 n.9 (1981). The preclusion meant that the probate judge could accept the 1980 findings as describing accurately the situation at that time. That situation was prognostic of the current situation, as the past influences the present, and the earlier findings therefore were relevant to and provided significant background for the present proceeding. Cf. *Petition of the Catholic Charitable Bureau of the Archdiocese of Boston, Inc. to Dispense with Consent to Adoption*, 395 Mass. 180, 185 (1985); *Custody of a Minor (No. 2)*, 22 Mass. App. Ct. 91, 94 (1986). The nexus of past and present is illustrated by the statutory authority to consolidate for trial a care and protection petition with a petition to dispense with parents' consent to adoption. See G. L. c. 210, § 3 (b); *Custody of a Minor (No. 1)*, 391 Mass. 572, 576-580 (1984). We add that the whole question of the admission of the earlier findings may be passed over because the parents do not point to an objection

---

[22] The application for permanent custody was made in the name of Virginia Lutz but she may well be regarded as a stand-in for the Department, which received custody. Even if Lutz is regarded as a party distinct from the Department, preclusion would operate against the parents as losing parties in the first case. See Restatement (Second) of Judgments § 29 (1980).

duly taken below, and anyway there was independent evidence in the record about family history starting in 1975 that made the 1980 care and protection findings largely redundant.

(c) *Statutory policy.* The decision below is attacked on the ground that it confirms the removal of the children from the parents when, it is argued, not enough was done by or through the Department to comply with the fundamental statutory policy toward "the strengthening and encouragement of family life for the protection and care of children." G. L. c. 119, § 1, as appearing in St. 1954, c. 646, § 1.[23] More particularly, the charge is that, at least from the time of the referral to IHC, the Department (or those through whom it acted) had a set purpose to release the children for future adoption and did not work seriously to reunite the family. As noted, the workers after intake analysis may have thought there was no reasonable chance of rewelding the family; but after February, 1981, they addressed themselves to that task. That the result was negative does not lend material support to the suggestion that the efforts made were merely pro forma or sham; nor does the record as a whole support such a suggestion. Rather the sad fact is that the parents chose not to cooperate or were psychologically incapable of cooperation — a measure of their unfitness.

In the same connection, the 1978 Departmental regulations are cited (106 Code Mass. Regs. 234.071, 234.050 et seq.) which provided that visits of parents with children were to be encouraged and described "service plans." As indicated, in the early period of residence at IHC visits by these parents were permitted and available but not affirmatively encouraged; later they were encouraged. A service plan was not formulated until September, 1981, but the cited regulations did not prescribe a timetable.[24] If in the former respect the regulations were not followed for a time, the breach was not such as to call for present remedy. See *Petition of the Department of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 585-586 (1981).

*Decrees affirmed.*

*Richard J. Chin* for the parents.

*Cheryl L. Conner,* Assistant Attorney General, for the Department of Social Services.

---

[23] The objection grounded on the statute (and regulations) was put in the form of a motion to dismiss.

[24] New regulations of March 1, 1981, dealt more particularly with service plans.