ADOPTION OF OLIVER.

No. 89-P-1371.

Suffolk. March 12, 1990. - May 25, 1990.

Present: WARNER, C.J., CUTTER, & ARMSTRONG, JJ.

*Adoption*, Dispensing with parent's consent. *Parent and Child,* Dispensing
with parent's consent to adoption. *Evidence*, Child custody proceeding.

In a proceeding to dispense with a parent's consent to adoption, the judge's
determination that the mother was presently unfit to care for her devel-
opmentally impaired child was supported by the evidence; a review of
the decree, as provided by its own terms, was to proceed expeditiously.
[624-627]

PETITION filed in the Suffolk Division of the Probate and
Family Court Department on May 28, 1985.

The case was heard by *William Highgas, Jr.,* J.

*Judith A. Kelley* for the mother.

*Jeremy A. Stahlin* for Boston Children's Service
Association.

ARMSTRONG, J. The mother of Oliver appeals from a de-
cree of the Probate and Family Court entered March 15,
1988, dispensing with the mother's consent to Oliver's adop-
tion. It was contemplated at that time that Oliver's foster
parents would adopt him. Due to a change of counsel for the
mother and to difficulties in locating the trial testimony and
getting it transcribed, the appeal was not entered in this
court until December 4, 1989. (Prompt briefing allowed the
case to be heard March 12, 1990.) The decree provided that
it should be reviewed one year from its date unless within
that time a decree of adoption should have been entered. See
pars. 12 and 13 of Rule Xa of the Uniform Practices of the
Probate Court (1982), which call for inclusion of a target
date for adoption in a decree dispensing with parental con-

sent. We assume no such review took place while the case was on appeal.

We need not decide in this case whether the one-year period stated in the decree was intended to run from the date of entry of the decree or from the date of the rescript affirming (as this decision does) the decree. Because of the two-year period that was lost in the appellate process, coupled with the sixteen-month period between the principal trial and the entry of the decree,[1] it is appropriate in this case that such a review be scheduled without delay, giving the mother an opportunity to provide any additional evidence that she may feel has a bearing on the question of her fitness to care for Oliver.

We emphasize this point, because it dilutes to some extent one of the principal contentions made by the mother in this court — namely, that the decree was based in large part on stale information, dating, as it did, from mid-1984, when the Department of Social Services was awarded permanent custody of Oliver.[2] The principal source of that allegedly stale information was the findings and rulings of the Boston Juvenile Court judge who heard the permanent custody case (a care and protection proceeding). These were entered February 28, 1985. The findings, which numbered 223, may fairly be characterized as an exhaustive treatment of the problems of the mother, Oliver, and Oliver's three brothers (all older) up to the trial in 1984.[3] The findings of the Juvenile Court judge were entered as an exhibit in this case, without objection or restriction. Approximately sixty of the judge's findings in the present case are based on (or are exactly duplicative of) those entered in the Juvenile Court. The remaining findings (about fifty in number) are, the mother argues, insufficient to show "grievous shortcomings or handicaps that

---

[1] See note 9, *infra.*

[2] The custody judgment was reviewed and continued in effect on May 14, 1985.

[3] At issue in that case was custody of Oliver and the next-youngest of the brothers, but many findings related to the two older brothers, whose personal problems contributed to the chaos in the home depicted in the findings.

would put [Oliver's] welfare in the family milieu much at hazard," *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975), this being an essential precondition to dispensing with parental consent. *Ibid.*

The mother does not dispute the general rule that the findings in earlier custody or care and protection proceedings are admissible in later proceedings relative to adoption and can be given evidentiary weight but not preclusive effect. *Adoption of Frederick*, 405 Mass. 1, 5-6 (1989). Rather, the gravamen of the argument seems to be that, (1) because the trial in this case took place before *Adoption of Frederick*, at a time when attorneys assumed that the findings essential to judgment in the earlier custody case were preclusive in their effect in the later adoption proceeding (see *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. 707, 710 n.9 [1981]), (2) because those findings were stale (two and one-half years old at trial, nearly four years when the probate judge's findings were entered[4]), and (3) because they were the basis of more than half of the probate judge's findings, their admission in this case was "improper, prejudicial . . . , and patently unfair."

We should be concerned if there were some indication that the probate judge had given the Juvenile Court findings improper effect: if, for example, he had treated the earlier finding of the mother's unfitness as determinative of her current unfitness or had depended on specific incidents of neglect at remote times to determine the mother's current capacity to care for Oliver. This certainly was *not* the case. The judge was fully aware that the issue before him was the mother's current fitness, not her past fitness. Reading his findings as a whole, it is clear to us that he used the findings for the entirely proper purpose of illuminating the history of the case, the events that led to the current proceeding, and underlying conditions, medical and otherwise, that are not readily susceptible of change.

---

[4]The procedural history is recounted in part in note 9, *infra.*

Here, we refer to the facts that the mother is afflicted by alcoholism and Oliver in turn by the symptoms of fetal alcohol syndrome. These were the subject of Juvenile Court findings. Under the holding of *Adoption of Frederick*, the mother could contest their veracity in the current proceeding. In fact, she did not do so; through counsel she readily conceded both facts. The focus of the trial, properly, was not on placing blame for what happened in the past but, rather, on the mother's current success (or lack thereof) in coping with her alcoholism, on Oliver's particular needs arising out of his impaired condition, and on the mother's potential for success in responding to those needs.

The mother's focus at trial was in showing that she had come to grips with her alcoholism in late spring, 1984, when she participated in a twenty-eight day alcohol treatment program at the Mattapan Hospital; that from that time she had attended Alcoholics Anonymous meetings on a fairly regular basis; that, following several years of trying to cope with her problems and those of her four children as a widow,[5] the mother remarried in 1985 and now had an established home; that she worked on a regular basis; and that since losing custody she had shown up often for scheduled visitations with Oliver and his next older brother.[6]

The petitioner, in seeking to dispense with the mother's consent to Oliver's adoption, was less sanguine about the mother's success in dealing with her alcoholism. It adduced evidence, which the judge believed, that its social workers had thought the mother to be under the influence of alcohol at least twice during the previous year and a half; that the mother's interaction with the children at the visitations was

[5]Her former husband, the father of the two older boys, had died of a heart attack in 1974. The mother was unmarried at Oliver's birth in 1980 and did not know the identity of his father.

[6]Of the bi-weekly meetings scheduled from May 15, 1985, to the time of trial in November, 1986, the mother had attended thirty-one and either cancelled or failed to show up for eighteen. The judge focussed on the six-month period from March 1, 1986, to September 11, 1986, finding that of fifteen visits scheduled in this period the mother "either cancelled, failed to confirm, or did not appear for nine." She did, however, attend the next four meetings immediately preceding the trial in November.

minimal (for the most part the two brothers played with each other, largely ignoring the mother's presence); that, while she had attended many of the bi-weekly meetings scheduled with Oliver and his older brother (see note 6, *supra*), she had generally failed to attend the meetings scheduled with a social worker to review the children's progress in their foster homes[7]; that the mother showed no initiative in inquiring as to the children's situations and progress, merely listening passively to what the social worker would bring up; and that the mother could realistically expect little support from her husband in caring for Oliver should custody be returned to her.[8]

The decisive factor, as we read the judge's findings, was Oliver's special needs. Oliver was born six weeks premature. He was discharged from the hospital after a month but returned five months later due to inability to gain weight. The Department of Social Services was given temporary custody when Oliver was nine months old, but his mother was soon thereafter awarded physical custody. He remained with the mother for the next two years, assisted by social workers and regular clinic visits. At that time the Department was again awarded custody, and Oliver was placed in a foster home. There he showed immediate improvement: his hyperactivity decreased, he began taking naps, he began sleeping through the night, and he no longer required close supervision that had been necessary in the past. He gained three and a quarter pounds in his first month in foster care.

The last was important. As noted, Oliver has been diagnosed as a fetal alcohol syndrome child, having some of the particular facial features of such children, retarded growth, and some neurological dysfunction. He is developmentally and mentally delayed. His psychological testing places him in

---

[7]Of nineteen scheduled meetings, six were kept. (The mother cancelled six and failed to cancel or show up for seven.)

[8]The husband was a truck driver. He testified that when he worked — he was currently out on workers' compensation for disability — he would typically work a ten to fourteen hour day, getting home too late to have dinner with his wife, and simply go to bed. He had not seen Oliver for more than a year before trial.

the borderline to retarded range. He is described as showing depression in his lack of social interaction with his peers. In the opinion of a pediatrician and child psychiatrist who had evaluated Oliver and testified as an expert witness, it will be pivotal to Oliver's development that he live in an enriched environment with constant stimulation, by which the doctor meant that he must have sustained contact with persons willing to take an active interest in his everyday life and willing to encourage him to take responsibility for himself. In such an environment Oliver could reasonably hope to achieve a functioning, independent status as an adult. Without it, Oliver could regress to the point of comprehensive dependence on societal support. The judge adopted this view. It was fully supported by the evidence.

Oliver's mother, in the judge's view, could not furnish the necessary environment. She regards Oliver as normal except for being small. She does not understand that he has special needs. She has shown no comprehension of his problems and does not acknowledge that he has problems. She plainly regards herself as having done a good job taking care of him in his earliest month, when, in the doctor's view, Oliver acquired problems of an emotional nature due more to his environment than to his being a fetal alcohol syndrome child. The mother has historically resisted counseling directed at assisting her in her problems and responsibilities. Oliver's foster parents — also evaluated by the doctor — provide, in his view, the right environment for Oliver, one of stimulation, support, and stability. There was evidence supporting the judge's finding that "[Oliver] showed more than one year's gain in psychological testing over the year preceding trial."

The judge's findings place this case within the line of authority holding that, although a parent's shortcomings, viewed in isolation, would not preclude his or her meeting the law's somewhat undemanding standard of parental fitness, they nevertheless do so when viewed against the more complex and attention-consuming needs of a child who has been impaired in his development by early neglect. Analogous are such cases as *Petition of the Dept. of Social Servs. to Dis-*

*pense with Consent to Adoption*, 16 Mass. App. Ct. 965, 966 (1983), *Adoption of Gregory*, 23 Mass. App. Ct. 948, 951-952 (1986), *Adoption of Abigail*, 23 Mass. App. Ct. 191, 195-196 (1986), *Adoption of Adam*, 23 Mass. App. Ct. 922, 923-924, 926 (1986), and *Adoption of George*, 27 Mass. App. Ct. 265, 268-269 (1989). See also *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 389 Mass. 793, 797-799 (1983); *Care & Protection of Stephen*, 401 Mass. 144, 153-154 (1987); *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 120, 125 (1984).

In cases of this type, where the finding of parental unfitness is grounded less in continuing incidents of neglect and more in the inability of the parent, however well intentioned, to provide for the child's special needs, it would be somewhat unusual for the passage of time — even a long period like two years — to alter the balance of considerations significantly. Nevertheless, the review called for by the decree is desirable, even if only to reevaluate Oliver's progress in his pre-adoptive placement, to confirm that it continues to work out as hoped, and, if not, to reassess the potential impact of separation from the pre-adoption home at this time and return to the mother. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 589-591 (1981). Without in any way prejudging the outcome of that review, we emphasize that much time has been lost already[9] and that the continuing uncertainty caused by this litigation undermines the familial security and stability widely thought conducive to child development. See *id.* at 588, and authorities cited. It is imperative, therefore, that priority be

---

[9]The case was originally tried in November, 1986, but the preparation of requests for findings of fact and an update report from the petitioner carried proceedings to July, 1987. Counsel for the mother represented at that time that she wished to present additional evidence to the court. A conference in November, 1987, resulted in scheduling the hearing for January 15, 1988, but the mother did not appear. Updates were heard from the petitioner, and the hearing was continued to January 22, to give the mother an opportunity to present evidence. She again failed to appear. The judge entered his findings March 15, 1988.

given to scheduling and completing the review called for by the decree.

*Decree affirmed.*