NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-757

ADOPTION OF GURPRIT (and two companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a bench trial, a Juvenile Court judge found the mother and father unfit to parent their three children and terminated their parental rights.  The mother, the father, and two of the children (Gurprit and Jamaal) appeal, arguing that the Department of Children and Families (DCF) failed to present clear and convincing evidence of unfitness and that the judge abused her discretion in terminating the mother's and the father's parental rights.  The mother also challenges the judge's order on posttermination visitation.  We affirm.

Background.  We summarize the judge's extensive factual findings, reserving some details for later discussion.  The mother has been involved with DCF both as a child and as a

_____

[1] Adoption of Liza and Adoption of Jamaal.  The children's names are pseudonyms.

mother.  She has been diagnosed with posttraumatic stress disorder (PTSD) and anxiety, which caused her to attempt suicide twice during her youth and multiple times thereafter, including during the pendency of this case.

The mother and the father started dating in 2009 when she was a freshman in high school and he was a sophomore.  Their first child, Gurprit, was born in 2010, and their younger two children, Liza and Jamaal, were born in 2012 and 2013 respectively.  The mother and the father's relationship was fraught with domestic violence.  The father was charged with assault and battery against the mother while she was pregnant with Gurprit; less than two years later, he was charged with assault and battery by means of a dangerous weapon against the mother.  The mother was granted restraining orders against the father after these incidents.  The mother was also the perpetrator of some of the violence and was later charged with assault and battery against the father.

DCF first became involved with the family in late 2012 when the mother filed a report under G. L. c. 119, § 51A (51A report) against herself, stating that she had physically abused Gurprit on three occasions.  The mother, who was then living in the home of her great-grandmother, with whom she had a tumultuous relationship, disclosed that she hit Gurprit because he was

2

aggravating the great-grandmother.  After an investigation DCF supported the allegations.[2]

Four months later, two 51A reports were filed alleging medical neglect of Gurprit by the mother.  By that time Gurprit had been diagnosed with a seizure disorder, a heart murmur, and a cancerous tumor on his kidney, which required surgery, chemotherapy, and radiation.  After an investigation DCF supported the allegations, finding that the mother failed to make medical appointments for Gurprit, was not consistently administering his medications, and was not available to his medical providers.

In 2014 multiple 51A reports were filed, and supported by DCF, based on the children's exposure to physical violence between the father and the mother.  During one incident in June 2014, the father punched the mother in the face and pushed Gurprit off the bed when he tried to intervene, causing him to hit his head on an open drawer as he fell.  The father then pulled the mother off the bed and punched her again.  The father fled the scene before the police arrived and was arrested and

---

[2] As relevant to this appeal, DCF's regulations provide that a 51A report will be "supported" if "[t]here is reasonable cause to believe a child(ren) was abused or neglected, or was or is at substantial risk of being abused or neglected" and "[t]he action or inactions by the parent(s) . . . place the child(ren) in danger or present substantial risk to the child(ren)'s safety or well-being."  110 Code Mass. Regs. § 4.32(2)(a) (2009).

charged with assault and battery the next day. Four months later, the parents got into another physical altercation while the children were sleeping. The children woke up, became scared, and started crying.

In 2015 multiple 51A reports were filed, and supported by DCF, for medical neglect of Gurprit. On two occasions (in April and July 2015), Gurprit was found unresponsive and transported to the hospital, where providers determined that he had hypoglycemia and was not eating enough. DCF's investigation also revealed that both parents repeatedly failed to take Gurprit to his neurology, oncology, and pediatric appointments. This led to DCF filing a care and protection petition on behalf of Gurprit on July 10, 2015. On July 30, 2015, Gurprit was placed in DCF custody.

In September 2015 three 51A reports were filed, and supported by DCF, for neglect of Liza and Jamaal by the mother. While the mother left the children unattended, a neighbor's child kicked and punched Jamaal, causing swelling and bruising on his face and head, abrasions on his back and knee, and scratches on his face and chest. Jamaal was transported to the hospital where a doctor concluded that, contrary to the mother's account, the extent of Jamaal's injuries indicated that the assault had lasted for far longer than a few minutes. On September 10, 2015, DCF filed an emergency care and protection

4

petition on behalf of Liza and Jamaal, and both children were placed in foster care.

In February 2016 the mother obtained a restraining order against the father. The father had repeatedly stalked and threatened to kill the mother after she said that she no longer wanted to be with him. In April 2016 the father was arrested for violating the restraining order and held for six months after a dangerousness hearing. In June 2017 the mother was granted another restraining order against the father after he threatened to kill her and the children. From 2016 to July 2019, the father had no contact with the children and did not provide any support to the mother.

Meanwhile, after the children were removed, the mother engaged in her action plan tasks, including individual therapy, supportive care, and parenting work. As a result the children were reunified with the mother between June and September 2017 and custody was returned to her in December 2017. At that time the mother was living with her wife, Ana, whom she had recently married. The children remained in the mother's custody for only one year, during which time multiple 51A reports were filed alleging neglect of the children by the mother. Gurprit reported to the DCF social worker that he saw the mother and Ana fight twice and that on one of those occasions the mother threatened Ana with a wrench. Jamaal reported that the mother

5

and Ana screamed and hit each other when they were mad, and all three children stated that the mother told them not to tell anyone what was happening in the home. DCF supported the allegations of neglect and further supported a 51A report alleging that the mother abused Gurprit by hitting him on the back of his neck with enough force to leave a bruise.

In December 2018 the mother asked DCF to put the children in foster care because she had nowhere to live and was unable to care for them. DCF took custody and then filed the underlying care and protection petition on December 19, 2018. In July 2019 the father became aware of the petition through newspaper publication and contacted his attorney.

The children experienced difficulties transitioning to foster care. Gurprit engaged in self-injurious behavior, made homicidal statements, watched video recordings on YouTube about suicide, and attempted to drown another foster child in the bathtub. After he broke multiple chairs at school, he was admitted to a community-based acute treatment (CBAT) unit at St. Ann's Home in Methuen, where his behavior improved. Liza and Jamaal also had multiple behavioral outbursts necessitating placements in several different foster homes. Each was also admitted at one point in 2019 to a CBAT unit at the Walker Home in Needham.

DCF planned to reunify Jamaal with the father in October 2020.  At the last minute, however, the father cancelled the reunification, stating that his living situation had become unstable because he had an argument with his then live-in girlfriend.  Following this failed reunification, Jamaal's mental health deteriorated.  He attempted suicide and was admitted to a hospital where he was restrained and medicated with an antipsychotic.  Jamaal, who was seven years old at the time, stated that he was "sad not to go live with dad" and that "nobody wants me."

After the children's second removal, the mother continued to experience volatility in her relationships and housing instability and also began drinking heavily while smoking marijuana often, which she continued to do until at least 2021.[3] In May 2019 the mother and Ana had a physical altercation, resulting in the mother's arrest for assault and battery and incarceration for thirty days.  The mother and Ana reunited a few months later, but their relationship continued to be marked by violence.  From January 2019 to January 2021, the mother's housing situation remained unstable, as did her employment.  She

_____

[3] To the extent Gurprit and Jamaal challenge the judge's factual findings regarding the mother's alcohol and marijuana use, we conclude that the findings are supported by the mother's testimony and are not clearly erroneous.  See Adoption of Ilona, 459 Mass. 53, 59 (2011).

7

was fired from one job in 2019 for an undisclosed reason and from another in 2020 for calling a coworker a "dog."

In late 2020 the mother moved into a shelter with the hopes of reunifying with Jamaal. In January 2021 DCF placed Jamaal with the mother, but their reunification lasted less than six months. During this time Jamaal was often falling asleep at school because the mother was bringing him with her to work at night; he also made homicidal and suicidal statements at school, which led to his hospitalization. In April 2021 the mother and Ana had a physical altercation at the shelter, which Jamaal witnessed.

In June 2021 the mother became agitated at shelter staff during an unsupervised visit with Liza. The mother met with a DCF social worker and told him that she had many issues with the shelter and wanted to stay at a hotel. When the social worker said he would have to take Jamaal if the mother did not return to the shelter, the mother fled with Jamaal. Liza became very upset and started crying. After speaking with the police, the mother met the social worker at a police station, where the situation escalated. The mother yelled at the officers that they would have to put a bullet in her head in order to take Jamaal, reached for their guns, and threatened to commit "suicide by cop." The mother was holding Jamaal, who was crying and yelling at her to calm down and listen to the officers.

Eight officers were required to restrain the mother and carry her to an ambulance. Jamaal, who was significantly traumatized by this incident, was returned to foster care but soon placed in a CBAT unit at St. Ann's Home after he punched his foster parents, locked himself in the bathroom, and tried to jump out the window. About five months later, the mother tried to commit suicide and was involuntarily hospitalized. In October 2021 DCF changed its goal for the children from reunification to adoption.

At the time of trial in mid-2022, Gurprit was in fifth grade and had recently transitioned to a group home at St. Ann's Home. He had diagnoses of PTSD, attention deficit disorder (ADD)/attention deficit hyperactivity disorder (ADHD), adjustment disorder with disturbance of conduct, and an unspecified depressive disorder. He was taking various medications and required support to manage his emotional outbursts, but had a strong bond with the staff at St. Ann's Home and was making progress in therapy. Liza was living in a foster home that she had been in since 2020.[4] She was enrolled in third grade at a therapeutic school but had improved to such an extent that she was ready to enter a public school. She had diagnoses of ADD/ADHD and oppositional defiant disorder and was

_____

[4] After the trial concluded, Liza's foster placement "disrupted," and she was placed at St. Ann's Home.

9

attending weekly meetings with her school counselor while on waitlists for therapy. Jamaal was in second grade at the St. Ann's Home residential school, where he still behaved aggressively despite weekly therapy. He had diagnoses of an unspecified trauma and stressor disorder, disruptive mood dysregulation disorder, and ADD/ADHD. DCF had not yet identified a preadoptive home for the children, but the adoption worker testified that she was confident in her ability to find a home based on her success in placing children with similar needs in the past.

Discussion. 1. Unfitness. Before terminating a parent's rights, the judge must first determine whether there is "clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is currently unfit to care for the child." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "[T]he idea of 'parental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.'" Adoption of Katharine, 42 Mass. App. Ct. 25, 28 (1997), quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 646 (1975). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular

needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016).

We discern no error in the judge's determination that DCF met its burden of establishing the mother's unfitness. The mother has a history of significant domestic violence in her relationships, both as a victim and as a perpetrator, and the children were often exposed or directly subjected to the violence. By the time of trial, the mother and Ana were separated, but remained married. The mother did not participate consistently in domestic violence services, and the judge found that she had not gained insight into the serious impact that domestic violence had on the children. The mother's failure to address her history with domestic violence demonstrated her inability to prioritize the children's welfare and safety. See Custody of Vaughn, 422 Mass. 590, 595 (1996) (witnessing domestic violence is itself "a distinctly grievous kind of harm"); Adoption of Paula, 420 Mass. 716, 729-730 (1995) (finding of unfitness supported by evidence that mother was unable to comprehend effect of abuse on children and participation in services had not appreciably improved her parenting capacity).

The mother also had serious mental health and anger management issues that she failed to address. She reported having suicidal thoughts in the weeks leading up to trial but

11

was not in treatment and did not have a psychiatrist. Throughout the proceedings, although the mother engaged in some individual therapy, her participation in services was largely inconsistent. She did not engage in anger management education, despite her history of lashing out at romantic partners, DCF workers, shelter staff, coworkers, and family members, including the children themselves. See Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973), quoting Richards v. Forrest, 278 Mass. 547, 552 (1932) ("Violence of temper . . . might constitute unfitness"). As the judge found, the mother's volatile behavior "alienates all potential sources of support in raising her children."

This constellation of factors in turn diminished the mother's ability to effectively parent the children and provide them with a safe home environment. The mother has not had stable housing since 2015, which the judge found was directly attributable to her struggles with anger management and unaddressed mental health issues. The mother's frequent physical and verbal altercations with shelter staff and people with whom she was living often required the mother and the children to seek alternative housing, causing the children substantial trauma and leaving them homeless on several occasions. The judge further found a direct correlation between the mother's neglect of the children and their struggles with

12

their own mental health. Even by the time of trial, however, the mother could not accurately identify the children's diagnoses, answer questions about their medications, or describe their educational needs. See Adoption of Oliver, 28 Mass. App. Ct. 620, 625 (1990) (mother properly found unfit where she had little understanding of child's substantial needs). All of this evidence taken together clearly and convincingly established that the mother is unfit.

Clear and convincing evidence also supported the judge's determination that the father is unfit. As discussed, the father's relationship with the mother was marked by extensive domestic violence, which often occurred in front of the children or involved them. See Custody of Vaughn, 422 Mass. at 595. When the mother tried to end their relationship in 2016, the father threatened violence against her and the children. He then effectively abandoned the children for three years, despite knowing that the mother was not providing them with a safe and stable home environment. See Adoption of Scott, 59 Mass. App. Ct. 274, 275 n.3 (2003) (finding of unfitness supported by evidence that mother left child "with inappropriate caretakers for extended periods").

Even after the father reentered the children's lives in July 2019, he showed that he placed his "own needs above those of the children." Adoption of Daniel, 58 Mass. App. Ct. 195,

13

202 (2003). Although DCF was willing to try reunifying the father with Jamaal, the father cancelled the reunification at the last minute, causing Jamaal to suffer extreme emotional harm. And, like the mother, the father had little insight into the children's substantial needs. He could not articulate any of the children's diagnoses, medications, or educational needs and was unwilling to seek out this information from the children's therapists, educators, and medical providers. He was also inconsistent with services and was unable to secure stable housing throughout the pendency of the case. Furthermore, at trial, the father took the position that custody of the children should be returned to the mother while he would help with childcare. The judge was thus warranted in concluding that the father saw himself as a "last resort" for the children and that he was "not willing to step up and be a full time parent." This evidence clearly and convincingly establishes the father's unfitness. See Adoption of Holly, 432 Mass. 680, 690 (2000) (father properly found unfit where he lacked insight into children's needs and could not articulate concrete plan to care for them).[5]

_____

[5] The father assigns error to a number of the judge's subsidiary findings. We have reviewed each of his challenges and conclude that they "take issue with the judge's assessment of credibility and the weight of the evidence, to which we accord substantial deference." Adoption of Peggy, 436 Mass.

14

We are unpersuaded by the appellants' arguments that the evidence of the parents' unfitness was stale.  The judge had evidence before her that, even at the time of trial, the parents lacked insight into how their behavior affected the children and did not understand the children's resulting significant needs.  As the judge found, the parents had not participated consistently in services and had not "sufficiently dealt with their anger management so as to prevent future harm to the . . . children."  See Adoption of Flavia, 104 Mass. App. Ct. 40, 49 (2024) ("the parents' significant history of domestic violence was not stale even though the relationship had improved by the time of trial, because in their testimony both parents denied and minimized the abuse and its effects on all three children").  Thus, this is a case where "[p]rior history . . . has prognostic value."  Adoption of Jacques, 82 Mass. App. Ct. at 607, quoting Adoption of George, 27 Mass. App. Ct. 265, 268 (1989).  The parents engaged in a decade-long pattern of volatility, instability, and neglect of the children and showed no meaningful improvement through participation in services.  DCF's

690, 702 (2002).  We see no basis on which to disturb the judge's view of the evidence.  In addition, we need not reach Gurprit's and Jamaal's claim that the judge impermissibly shifted the burden of proof to the father, as they do not support the claim with adequate discussion.  See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).

15

attempts to reunify the mother with the children failed, as did its attempt to reunify the father with Jamaal. The judge was entitled to rely on this past history, which had continuing vitality, in assessing the parents' fitness. See Adoption of Ulrich, 94 Mass. App. Ct. 668, 676 (2019) ("a judge can consider a pattern of past conduct to predict future ability and performance" [quotation and citation omitted]).

2. Termination. Once a parent is found unfit, the judge must then determine whether the child's best interests will be served by terminating the parent's legal relationship with the child. See Adoption of Nancy, 443 Mass. 512, 515 (2005). We accord "substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

Here, the judge was within her discretion to find that the mother's and the father's unfitness was not temporary and that termination was in the children's best interests, in light of each parent's failure to meaningfully address the issues that led to the children's removal, as discussed above. See Adoption of Ilona, 459 Mass. at 60 ("Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period"). Contrary

16

to Gurprit's and Jamaal's argument, the judge did consider their desire for reunification but was warranted in concluding that DCF's plan of adoption offered the best hope for their future stability and success.  See Adoption of Nancy, 443 Mass. at 518. (children's wishes in custody determinations should be considered by judge but are "neither decisive . . . nor outcome determinative").  Nor are we persuaded by the mother's argument that DCF's plan was unrealistic because it "was simply not viable" to identify a single adoptive resource for all three children.  The judge expressly credited the adoption worker's testimony that she was confident she could find a home where the children could live together, given her past success in locating homes for children with similar needs.  We defer to the judge's assessment of witness credibility.  See Adoption of Larry, 434 Mass. 456, 462 (2001).

3.  Visitation.  Following entry of the termination decrees, the judge scheduled additional evidentiary hearings to address visitation.  Meanwhile, both parents continued to have visits with the children.  After the hearings, which were held in early 2023, the judge ordered that the mother have four posttermination visits per year, while affording the father monthly posttermination visitation.  The judge deferred entering an order on postadoption visitation until adoptive resources were identified for the children.

17

The mother challenges the judge's decision to order only quarterly posttermination visitation, arguing that the judge should have credited the opinion of the mother's expert witness that monthly visitation would be appropriate.[6]  Whether "to order posttermination or postadoption visits is left to the judge's discretion."  Adoption of West, 97 Mass. App. Ct. 238, 247 (2020).  We discern no abuse of discretion here.  The mother's expert had not interviewed the children in over one year.  The expert therefore had not spoken with the children after the mother's posttermination visit in November 2022, which, as the judge found, was "disastrous" and "resulted in police intervention and a significant disruption" for the children.  Indeed, the visit ended with "all three children having to be taken by ambulance from the DCF office to be crisis screened at the hospital," where Liza had to be physically and chemically restrained.  In light of this evidence, the judge's decision to limit the mother's posttermination visits to four times per year was well within her discretion.  For the same reason, we see no merit to the mother's argument that the judge abused her discretion by affording the father more frequent visits.

---

[6] While this appeal was pending, DCF filed a motion in the Juvenile Court to modify the posttermination visitation order. Because the motion has not yet been resolved, we address the visitation issues as they currently stand.

Finally, we are unpersuaded by the mother's claim that the judge should have made an order for postadoption visitation. The judge appropriately reserved that issue for further hearing after the identification of preadoptive homes for the children. See Adoption of Jacques, 82 Mass. App. Ct. at 610.

Decrees affirmed.

By the Court (Shin, Grant & Smyth, JJ.[7]),

Clerk

Entered: August 20, 2024.

---

[7] The panelists are listed in order of seniority.