The mother and the putative father[3] appeal from decrees issued by a judge of the Juvenile Court finding them unfit[4] to assume responsibility for the child, Jeanette, and terminating their parental rights. See G. L. c. 119, § 26 ; G. L. c. 210, § 3. The putative father argues that there was insufficient evidence to terminate his parental rights and that such termination is not in Jeanette's best interests. The mother argues that a number of the judge's factual findings are clearly erroneous, that they do not support the judge's conclusion that she is unfit, and that termination of her parental rights is not in Jeanette's best interests. The mother also argues that the judge abused her discretion by denying the mother's motions for relief from judgment based on ineffective assistance of counsel. We affirm.
Background. The trial judge made a total of 169 findings of fact based on three days of testimony from five witnesses and the introduction of twenty-nine exhibits. Jeanette was born in 2006 and was ten years old at the time of the termination of parental rights trial in February, 2016. Jeanette was born prematurely and, by the time of trial, had been diagnosed with a seizure disorder, autism, global developmental delays, comorbid attention deficit hyperactivity disorder (ADHD), a feeding disorder, and a motor skills disorder. She is nonverbal, communicating with the aid of a NovaChat electronic device and through sign language. Jeanette has three older brothers, two of whom experience some developmental delays, and until the initiation of the underlying care and protection proceeding, she lived with her brothers and the mother at the maternal grandparents' home. Jeanette's putative father never resided with the family, but instead lived and worked in a nearby city and supported the family financially.[5]
Involvement with the Department of Children and Families. The Department of Children and Families (DCF) first became involved with the family in 2004 after a report pursuant to G. L. c. 119, § 51A (51A report), alleging neglect was filed, relating to the cluttered condition of the maternal grandparents' house. In August, 2007, another 51A report alleging neglect was filed by a family relative, who was concerned that two of the boys were restrained in their high chairs for several hours, that Jeanette was left in her port-a-crib during that time, and that the house was extremely unsafe due to clutter.[6]
Between 2010 and 2012, a series of tragic events occurred, including the death of the maternal grandmother in 2010, a fire causing substantial damage to the home, and the mother's major surgery to remove her thyroid. In September, 2013, a mandated reporter at Jeanette's doctor's office filed a 51A report alleging neglect of Jeanette by her mother.[7]
In February, 2014, the mother was admitted to the hospital due to her inability to walk or move, which had developed gradually since the preceding year. She remained hospitalized until early June, 2014, when she was discharged to a rehabilitation facility, having been diagnosed with sensorimotor polyneuropathy. The children remained in the care of the maternal grandfather, with the putative father visiting the home several evenings a week to assist with groceries and laundry. Mandated reporters filed 51A reports in February and March, 2014, alleging neglect of Jeanette due to her extended absence from school since February 7, 2014, and concerns related to her status as a child with severe special needs. On March 7, 2014, a DCF social worker visited the home, where the maternal grandfather told the social worker that he was taking care of the children and that he had not sent them to school for several weeks because he did not know the bus schedule. The mother, although hospitalized, promised to provide him with that information.
Between April 4 and April 11, 2014, three 51A reports were filed alleging the neglect of Jeanette and her brothers.[8] On May 9, 2014, the putative father and the maternal grandfather met with a DCF social worker to report their inability to care for the children due to the putative father's housing and work schedule constraints, and the maternal grandfather's imminent plan to sell the family home. DCF then assumed emergency custody of all four children. Jeanette has remained in DCF custody since that time.
The instant care and protection petition on behalf of the children was filed in May, 2014. At the subsequent seventy-two hour hearing, the mother and the putative father waived their rights to oppose the continuation of the temporary custody order, allowing the children to remain in DCF custody pending a hearing on the merits of the petition. While the boys were eventually placed together in a foster home, Jeanette was initially placed at the Stars Program and then relocated to a separate foster home in June, 2014. When she entered foster care, Jeanette was not toilet trained and her diet consisted entirely of Ensure (a nutritional supplement drink) and puréed baby food. She also was not used to a sleeping routine, and her foster mother observed that Jeanette spent a significant portion of the school day sleeping, which caused her to miss a great deal of her educational instruction. Under the care of her foster mother, Jeanette made significant progress in a short time, including beginning toilet training, establishing a sleep schedule to ensure that she stayed awake during school, introducing new and solid foods to her diet, and experimenting successfully with different methods of communication. At school, Jeanette also made significant improvements with physical therapy and in socializing with others. Her pediatrician eventually determined that Jeanette's academic, social, and emotional needs would best be met in a twenty-four hour residential care and educational facility, and consequently she was placed in such a program beginning in late October, 2014. She remained placed there at the time of the termination of parental rights trial in February, 2016.
A trial on the care and protection petition was held on February 24, 2015. The mother appeared and submitted a stipulation assenting to the findings, to an adjudication that each child was in need of care and protection, and to custody orders. After the trial, which the putative father did not attend, the judge adjudicated each child in need of care and protection and committed them to the permanent custody of DCF. On May 5, 2015, at a permanency planning hearing held pursuant to G. L. c. 119, § 29B, the judge determined that DCF should pursue a "family find search" to explore the possibility of other family members as potential guardians for Jeanette. On May 13, 2015, the judge held a permanency planning for the three boys; the judge determined that reunification with the putative father was in their best interests. On June 11, 2015, at another permanency planning conference, DCF changed its goal for Jeanette to adoption, and the mother and the putative father were asked to provide the information of any potential relatives who could be an adoption resource for her. Neither parent ever provided such information to DCF. At a hearing on September 23, 2015, permanent custody of the three boys was granted to their father, with the assent of all parties, and the judge allowed DCF's motion to schedule a termination of parental rights trial regarding Jeanette. At the February 10, 2016, final pretrial hearing, the mother filed a motion seeking an order that DCF provide her with services to accommodate her disability and requested that the motion be consolidated with and scheduled for hearing with the termination of parental rights trial scheduled for February 23, 2016.
After three days of trial, the judge took the matter under advisement. She issued an order terminating the mother's and the putative father's parental rights, which entered on April 7, 2016. The mother and the putative father filed timely appeals. On February 27, 2017, the judge denied the mother's motion requesting that DCF provide services to accommodate her disability, and issued extensive findings of fact.[9] The mother subsequently filed two motions for relief from judgment and for a new trial. Those motions were denied by the trial judge, and the mother's appeal from the denial was consolidated with the appeal from the decrees.
Discussion. Termination of parental rights requires a two-part, interrelated analysis, and may occur only after a judge determines by clear and convincing evidence that (1) a parent is unfit, and (2) termination is in the child's best interests. See Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). The question for the judge is "whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.' " Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998). Further, it is possible that a parent may be found fit to parent one child and not another based on that child's particular needs. Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. 120, 125 (1984). The judge's findings of fact "must be left undisturbed absent a showing that they are clearly erroneous." Adoption of Kimberly, 414 Mass. 526, 529 (1993).
Mother's unfitness and termination. The mother first argues that the findings collectively fail to prove parental unfitness. However, the findings are supported by the record, and when viewed in the aggregate clearly and convincingly demonstrate her unfitness to parent Jeanette, a child with significant special needs.[10]
During the mother's supervised visits with the children, she struggled with her parenting skills and with meeting the children's immediate needs absent prompting by the social worker. Initially, in her visits with the mother, Jeanette needed encouragement from the social worker to engage with the mother directly. These visits apparently improved over time, and Jeanette seemed to enjoy seeing both the mother and her older brothers. The mother was "fairly attentive" to Jeanette's needs during these visits, but she still required occasional prompting from the supervising social worker to attend to Jeanette's need to use the bathroom or to eat.
Nevertheless, the record reflects that the mother's attention to Jeanette was limited to the confines of those visits. The mother's DCF social worker provided her with the contact information for Jeanette's case worker at her residential program. Other than calling to schedule her supervised monthly visits with Jeanette, it does not appear that the mother ever contacted staff at the program to discuss in any detail Jeanette's various medical conditions or her daily routines and needs, including her specific diet or what medications she was prescribed and why. The mother's clear lack of knowledge of, or interest in, how to properly care for Jeanette supports the judge's finding that the mother is unfit to meet Jeanette's heightened and specialized needs.
Following the mother's discharge from the hospital in June, 2014, she began a lengthy stay at a rehabilitation and long-term skilled nursing care facility, and still resided there at the time the termination trial began in February, 2016.[11] Although the mother initially required extensive physical and occupational therapy, by the time of trial, the only treatment she was receiving from the facility was medication for her diagnoses and the occasional session with the facility's therapist. At the time of trial, the mother required a walker to move about, was being treated at the facility for hypertension and depression, and was meeting with a counsellor. She had difficulty articulating what medications she was taking and the names of her treating doctors and counsellors.
Despite reaching her therapeutic goals, the mother continued to reside at the facility for over a year before trial as she struggled to find housing she felt was adequate. Through the fall of 2015 and the winter of 2016, she received assistance in exploring different housing options from the director of nursing at the facility, a HESSCO case worker, and her DCF social worker. The DCF social worker discussed with the mother potential transition plans from the facility to adult foster care or group homes, provided her with numerous applications to various local housing authorities, and explained to her what the barriers were to finding housing for herself and all of the children.
It is in a child's best interests to be placed with caretakers who will "on a consistent, long-term basis, assume all parental responsibilities," and who can provide the "stable and continuous care and nurturing" that the child might need. Adoption of Gwendolyn, 29 Mass. App. Ct. 130, 136 (1990). Jeanette is now twelve years old and in need of constant, specialized care from adults who are familiar with her developmental and cognitive disabilities. The judge's findings plainly support that the mother is unable to assume such parental responsibilities for Jeanette on a consistent, long-term basis. The mother struggled at the time of trial to care for herself. The judge's finding that the mother was unfit to care for Jeanette was supported by clear and convincing evidence.
The mother next argues that DCF's services were insufficient to the point of delaying her recovery. "Where a parent ... has cognitive or other limitations that affect the receipt of services, [DCF's] duty to make reasonable efforts to preserve the natural family includes a requirement that [DCF] provide services that accommodate the special needs of a parent." Adoption of Ilona, 459 Mass. 53, 61 (2011). Importantly, even if DCF is determined not to have met its obligation in this respect, "a trial judge must still rule in the child's best interest." Id. Here, it is clear that DCF provided the mother with numerous appropriate services. It is speculative to state that with additional services she would have recovered faster.[12]
Finally, the mother (joined by the putative father) argues that the judge abused her discretion by denying the mother's motions for relief from judgment based on ineffective assistance of counsel. The mother also argues that she should have been granted an evidentiary hearing on her motion pursuant to Mass. R. Civ. P. 60 (b) (6), 365 Mass. 828 (1974).[13] "A judge's denial of ... a rule 60(b) motion is within her discretion and is entitled to great deference by a reviewing court" and "will not be reversed on appeal except on a showing, by clear and convincing evidence, that the judge abused her discretion." Adoption of Gillian, 63 Mass. App. Ct. 398, 411 (2005). To succeed on an ineffective assistance of counsel claim, the mother must establish that the "behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer and ... [that such conduct] likely deprived [the mother] of an otherwise available, substantial ground of defence" (quotation omitted). Adoption of Mary, 414 Mass. at 712.[14]
Here, by her own testimony, the mother was unable to articulate her own disabilities or what specific additional services she required from DCF that she was not already receiving. Under the circumstances, the mother's attorney was not under a duty to file a motion for services to accommodate the mother's disability, and the fact that such motion was eventually filed untimely did not prejudice her. Relatedly, the judge did not find that DCF provided inadequate services, which supports the mother's attorney's decision not to file any motions that would have compelled DCF to provide additional services related to housing applications. She further argues that her attorney failed to introduce evidence of her prior ability to take care of Jeanette. However, the judge did consider such evidence of past parenting and still found the mother unfit to parent Jeanette.
The mother's arguments that she received ineffective assistance based on trial counsel's failure to move to strike "unattributable hearsay and opinion," and to hire a parenting expert, are similarly unpersuasive. The judge was within her discretion to admit the court investigation report in evidence and to rely on its contents. See Adoption of Keefe, 49 Mass. App. Ct. 818, 826 (2000) ("facts contained in such reports are admissible by statute where opposing parties have an opportunity to refute the report through cross-examination"). Similarly, the judge, in her November 15, 2017, order denying the mother's motion for a new trial, acted well within her discretion in finding that, given the extent of credible evidence supporting the mother's unfitness, any parenting evaluation would likely have harmed the mother's trial position. See Commonwealth v. Sellon, 380 Mass. 220, 225-226 (1980).
Putative father's unfitness and termination. The putative father primarily argues that the evidence was inadequate to support a finding of his unfitness. Although he asserted that he went to the family home several times a week to help care for the children while the mother was in the hospital, Jeanette and her brothers missed several weeks of school and consistently attended school in an unkempt condition with soiled clothes. While the putative father visited the three boys regularly while they were in foster care, brought them to visit the mother in the hospital, and took a leave of absence from work in order to find housing to accommodate both himself and the boys, he managed to visit Jeanette only twice in 2014 after she had been taken into DCF custody. See Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. at 125. The putative father did not visit Jeanette at her residential program and was also inconsistent in taking her brothers to visit her there. See Guardianship of a Minor, 1 Mass. App. Ct. 392, 396 (1973) ("indifference or vacillation of feeling toward the child ... might constitute unfitness"). Although he informed his social worker in October, 2015, that he would personally coordinate his visits with Jeanette, he never attempted to schedule a visit and never called to inquire about her medical treatment or conditions. He also failed to respond to numerous requests by DCF to provide the contact information of any relatives who could function as adoption resources for Jeanette. By the time of trial in February, 2016, the putative father had not visited Jeanette since September, 2014, and, while he had taken great strides to accept DCF assistance in caring for the three boys, had shown little interest in parenting Jeanette.
Best interests of the child. The mother and the putative father both argue that termination of their parental rights is not in Jeanette's best interests and instead renders her a "legal orphan." Parents have certain protected rights concerning their children. However, "the parents' rights are secondary to the child's best interests and ... the proper focus of termination proceedings is the welfare of the child" (quotation omitted). Adoption of Ilona, 459 Mass. at 61. It was appropriate for the judge to consider evidence of Jeanette's condition when she lived with the mother and compare it with her improved development since she had been in DCF custody. See Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption, 395 Mass. 180, 185 (1985). Here, there is unchallenged evidence that once Jeanette was placed in foster care, her sleeping schedule was regulated, new and varied foods were introduced to her diet, she began communicating through new and different methods, her socialization skills improved, and she improved her toilet training. Prior to her removal from the mother's custody, Jeanette's needs in these regards were not being met. Further, as discussed previously, neither parent has the knowledge or ability to meet Jeanette's extensive medical, social, and educational needs. The judge did not err in finding that that these deficiencies would likely continue indefinitely.[15]
In making her determination that adoption is in Jeanette's best interests, the judge also considered, pursuant to G. L. c. 210, § 3 (c ), the sufficiency of DCF's proposed adoption plan. The judge found that the plan contained "sufficient content and substance" to permit her to measure DCF's goals with regard to Jeanette's adoption. See Adoption of Stuart, 39 Mass. App. Ct. 380, 393 (1995) ("The adoption plan must ... have content and substance enough to permit the court meaningfully to evaluate and consider, as the statute mandates, what [DCF] proposes to do for the child by way of adoption"). The plan specifically notes that more options will be available to Jeanette to facilitate a successful adoption once the birth parents' parental rights are terminated. The plan accounts for Jeanette's extensive special needs, the kinds of families DCF hopes to recruit, and lists, in detail, numerous specific recruitment opportunities to expose her to potential adoptive parents. Jeanette's adoption worker felt "positive" that she could find a suitable family for Jeanette once she was legally freed for adoption.
Conclusion. The judge did not err in finding both the mother and putative father unfit to meet Jeanette's specific, substantial needs and in terminating their parental rights. Further, the judge did not abuse her discretion in denying the mother's motions for relief from judgment based on ineffective assistance of counsel or substantial change in circumstances.
Decrees affirmed.
Order denying motions for relief from judgment and for evidentiary hearing affirmed.

The putative father does not appear on the child's birth certificate, and although he has been involved in her life in a paternal role, he has never legally established his paternity.

"Despite the moral overtones of the statutory term 'unfit,' the judge's decision is not a moral judgment, nor is it a determination that the parent does not love the [child]. The question for the judge is whether the parent's deficiencies place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child" (quotations omitted). Adoption of Lisette, 93 Mass. App. Ct. 284, 285 n.2 (2018).

He is also the father of Jeanette's three older brothers.

An investigation pursuant to G. L. c. 119, § 51B, was initiated, and on a subsequent visit by a DCF social worker and her supervisor, the home was found to be somewhat cleaner per DCF's instructions. The mother scheduled a medical appointment for Jeanette following these visits from DCF. Jeanette's doctor noted that she was behind on immunizations and that she should begin early intervention services as soon as possible. DCF closed that case with the family several years later in January, 2010, when all of the children's medical care had been made current and there were no further protective concerns.

Jeanette, despite her significant disabilities and feeding issues, had not been to the pediatrician's office for a check-up in over two years. The mother informed the social worker conducting a home visit on September 16 that she had scheduled a medical appointment for Jeanette for the following day, and that the maternal grandmother's death in 2010, along with the house fire, had caused her significant stress which in turn made it difficult for her to keep track of the children's medical appointments. DCF closed that case in October, 2013, after the mother addressed Jeanette's lapsed medical care.

Specifically, Jeanette was repeatedly sent to school in stained and ill-fitting clothing, smelling of urine, and with her hair, teeth, and nails unkempt. Further, beginning in mid-March, the maternal grandfather stopped sending liquefied food to school with Jeanette, an established, necessary routine for her because she had been diagnosed with a feeding disorder. Despite the school staff's and DCF social workers' numerous conversations with the mother, the putative father, and the maternal grandfather regarding the health, safety, and well-being of the children, all of the children continued to present at school as "unkempt, unclean, and unprepared."

These findings included that both the mother and the putative father were unfit to further the best interests of Jeanette or to assume parental responsibility for her care, that Jeanette's best interests would be served by the termination of their parental rights, that DCF's proposed adoption plan was sufficiently detailed and specific enough to serve Jeanette's best interests, and that continued contact with the mother and the putative father and her three brothers was also in Jeanette's best interests. The judge considered the fourteen factors set forth in G. L. c. 210, § 3 (c ), and found that eight were applicable to this case.

Further, to the extent that the mother challenges specific findings of fact, we find that her arguments either misconstrue what the judge actually found, or misinterpret the findings, which are otherwise supported by the record.

Several of the mother's caretakers at the facility during the fall of 2014 noted that the mother presented as lacking in motivation and that her daily living capabilities were higher than her actual performance. She was reported as staying in her room watching television and not accessing services that were available to her. The mother eventually underwent a neuropsychological evaluation, which DCF had been requesting since the case's inception. However, for reasons that are not clear, the complete evaluation was not provided to the court.

Services provided by DCF included assisting the mother to obtain and complete housing applications and facilitating visitation between her and all of the children. Many of the services the mother claims DCF did not provide her with were already in place either through the rehabilitation facility (including her neuropsychological evaluation and counselling) or by her own initiative (including transportation), and thus would have been either unnecessary or duplicative.

Rule 60 (b) (6) applies by analogy to termination of parental rights cases. Adoption of Gillian, 63 Mass. App. Ct. 398, 410 (2005).

Further, "the case law is replete with comments that, in ineffective assistance claims, the court is entitled to draw a negative inference from the defendant's failure to secure an affidavit from trial or plea counsel." Commonwealth v. Martinez, 86 Mass. App. Ct. 545, 550 (2014). We note that the record before us does not contain any evidence of such affidavit and, in its absence, such claim is usually not persuasive.

The judge also found that posttermination visitation with the mother, putative father, and three brothers was in Jeanette's best interests, and ordered that the mother was entitled to monthly supervised visits. The frequency of the visits was increased to weekly upon the mother's motion in November, 2017.